Filed 6/20/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B239508 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA376905) |
| v. | |
| BRANDON LEATH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge.  Affirmed.

Michael Chelvam for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Elaine F. Tumonis, Deputy Attorneys General, for Plaintiff and Respondent.

Following the denial of his motion to suppress evidence (Pen. Code, § 1538.5),[1] defendant Brandon Leath pled guilty to two counts of second degree robbery. (§ 211.) He now appeals from the judgment of conviction, urging that the trial court erred in denying his motion to suppress. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### I. The October 7, 2010 Armed Robbery

On October 7, 2010, Osmara Merlo, Jorge Vasquez, and Daniel Guillen were robbed at gunpoint near the corner of 43rd Place and Sixth Avenue in Los Angeles. Two suspects approached in a dark SUV, pointed a gun at Merlo's head, and told her to give them her purse. When Vasquez and Guillen approached, the suspects pointed the gun at them and told them to empty their pockets. Vasquez handed the suspects an iPod, iPhone, and a Zune player, and the suspects took Guillen's phone and wallet from his pockets. The suspect with the gun then told Merlo, Vasquez, and Guillen to turn around and run.

Officers arrested defendant and codefendant Timothy Brewer shortly after the robbery. A subsequently filed information charged defendant with three counts of second degree robbery; it also alleged defendant had committed a serious or violent felony as a juvenile.

### II. The Suppression Motion

On March 2, 2011, defendant moved to suppress all physical evidence seized from his person and vehicle, as well as all statements he made to the arresting officers, on the grounds that the arresting officers lacked probable cause or a reasonable suspicion to detain him.

---

[1]     All further statutory references are to the Penal Code.

The court held a hearing on the motion on April 29, 2011. Officer John Ishigami testified at the suppression hearing that on October 7, 2010, at about 11:30 p.m., he and his partner, Officer Quinata, were dispatched to investigate an armed robbery at 43rd Street and 6th Avenue in Los Angeles. The officers spoke to the three victims, who said they had been walking home when a dark SUV came towards them. The person on the passenger side of the SUV got out first, approached Merlo, pointed a gun at her, and said, "Give me your stuff." She handed over her purse. Merlo's friends, Vasquez and Guillen, ran towards her to see what was going on, and the suspects "pocket checked" them at gunpoint. The suspects then said, "Four-Eighth Street. Start running." Officer Ishigami said that "Four-Eighth Street" refers to a street gang in the area.

The victims described the suspects as African-American men, approximately 20 years of age. One suspect was wearing a blue Cardinals jacket. The victims said the SUV was either burgundy or dark in color. They were not able to otherwise describe the SUV.

While Officers Ishigami and Quinata were speaking to the suspects, two additional officers, Leary and Holliman, arrived. Officer Ishigami told Officers Leary and Holliman what they had learned—i.e., that the suspects were members of the Four-Eighth Street gang and were driving a dark SUV. Officers Leary and Holliman spoke to the victims for about two minutes and then left to search for the suspects' vehicle.

Several minutes later, Officer Ishigami learned that Officers Leary and Holliman had detained defendant about two blocks from the crime scene. He immediately drove to where defendant was detained. Officer Leary told Officer Ishigami that "this SUV never quite made it to the curb itself and the back passenger door was open. He said defendant Leath was walking up the driveway towards the house at that time and that's when [Officer Leary] says, 'Hey, you know, you left your back door open.' To which he said, 'Oh, thanks. I did[,]' or something to that effect. And that's when they end up taking him into custody, thinking that something was a little weird at that situation." Officer Leary said he detained defendant because "the situation just seemed weird, this Four-Eighth Street, that was the area that the defendant or the suspects indicated that they were

3

from. 48th Street was the street they just happened to be crossing upon. They were one block west of the location itself when they see a dark colored SUV traveling the other direction. They figure it's good enough for a stop. They pull around the corner. By then that car had already parked and people were already out of the vehicle, so they never got a chance to light them up or anything. They just talked to them."

After defendant was taken into custody, Officer Quinata found victim Merlo's driver's license near defendant's vehicle. As Officers Ishigami and Quinata drove back to tell the victims that they might have a suspect in custody, they learned from a police broadcast that another suspect had been discovered underneath a car near defendant's SUV.

Officer Leary testified at the suppression hearing that when he arrived at the crime scene, Officers Ishigami and Quinata were speaking to the robbery victims. Officer Leary spoke to both the victims and the officers. The officers asked him to canvas the area for a dark SUV in the 48th Street clique area. He looked in that area because the suspects had said they were "Four-Eighth Street," which is street vernacular for the 48th Street clique of the Rollin 40's street gang. As Officer Leary and his partner crossed the intersection of 48th Street and 4th Avenue, they saw a dark SUV traveling northbound on 3rd Avenue. The officers turned onto 48th Street and then onto 3rd Avenue. As they turned onto 3rd Avenue, they saw that the dark SUV had parked near the curb, "but not close, but kind of like it looked like in a hurry. And we saw the rear passenger door of the SUV open and we saw one male Black walking from the driver's side door up a driveway." Officer Leary identified defendant as the individual he saw walking away from the vehicle. The officers got out of the car and Officer Leary said, "Hey, sir, you left your rear door open." Defendant said, "Oh, oh, shit, I did," and walked back toward the car. Officer Leary asked if the SUV was his, and defendant said yes. Officer Leary then asked what defendant was doing in the area. Defendant said either, "This is my friend's house" or "my cousin's house." Officer Leary asked defendant's name and asked him if he had any identification. Defendant handed Officer Leary his identification card. At that point, the officers had not detained defendant. The officers ran defendant's

4

name through their database and discovered "about a hundred thousand dollars worth of traffic warrants." The officers then arrested defendant on the outstanding warrants. Approximately five to seven minutes passed from the time the officers arrived on the scene until they handcuffed defendant.

Officer Leary explained why he asked for defendant's identification as follows: "[W]e were investigating a robbery that just occurred. We had a — we heard the crime broadcast of a dark SUV. We have a dark SUV that we observed. It's not, I guess, normal to see a vehicle hit or park that fast on the curb and then have a rear door left open as one, you know, one person's walking away from the driver's side on [the] complete opposite end of the vehicle."

When they realized defendant had open warrants, they arrested him. Minutes later, Officer Ishigami saw a California identification card on the grass. Officer Leary picked it up and saw that it belonged to the victim Merlo. Officer Leary then started canvassing the area and found several items in the grass, including an iPod. As he did so, he saw something moving under a nearby vehicle and discovered codefendant Brewer hiding under the vehicle. Brewer was wearing a red St. Louis Cardinals jacket. After Brewer was taken into custody, Officer Leary continued searching the area and found several items of the victims' property under the car where Brewer had been hiding.

The court denied the motion to suppress. It explained that when Officer Leary initially approached defendant, "in my estimation, [he] has a consensual encounter with Mr. Leath. He doesn't tell him to stop. He doesn't — he just calls out to him 'Hey, you left your back door open. You left your car door open.' He says it twice. And then Mr. Leath says, 'Oh, yeah, I did.' He voluntarily returns. The officer didn't order him to come back. He voluntarily returns. At this point I think . . . the officer clearly is within his right to suspect that this defendant who is a young male Black who looks — who could clearly look to be in his twenties, I think — I would think that he could be in his twenties. He asked him his name. He asked him for — the defendant voluntarily hands him his I.D. He decides to run him and he comes back with [outstanding] warrants. At that point would there have been probable cause to believe he was the person engaged in

5

the robbery?  I don't think so, but at that point he — had it bec[o]me known that he had a hundred thousand dollars in arrest[] warrants, I think the officer was — had probable cause to investigate this, but notwithstanding that, I think the encounter with the defendant was consensual. . . .  I think the *Williams*[2] case is distinguishable because in that case the police pulled over the car because they were merely — they had a mere curiosity, which the law does not favor.  And then while — and then [they] took a bunch of time to inquire of them about the robbery.  That didn't happen in this case.  I believe the defendant was stopped . . . in a legal fashion.  I think what happened thereafter clearly led to probable cause to arrest them for the robbery, that is, the recovery close to the car of the property from the robbery victims."

### III.   Defendant's Plea, Conviction, and Appeal

On July 28, 2011, defendant pled no contest to counts 1 and 2 and admitted the prior conviction.  The court sentenced defendant to two concurrent 6-year terms in state prison (calculated as the midterm of three years, plus three additional years under the "Three Strikes" law), for a total aggregate term of six years.  Defendant appealed.

### DISCUSSION

Defendant contends:  (1) Officers Leary and Holliman detained him when they asked for and retained his identification card; and (2) the detention was illegal because the officers lacked probable cause or reasonable suspicion to believe he had committed a crime.  We consider these issues below.

The denial of the suppression motion may be challenged by an appeal from the judgment entered after defendant's guilty or no contest plea.  (§ 1538.5, subd. (m); *People v. Walker* (2012) 210 Cal.App.4th 1372, 1379-1380.)  "'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to

---

**2**      *Williams v. Superior Court* (1985) 168 Cal.App.3d 349 (*Williams*).

6

the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597; *People v. Lawler* (1973) 9 Cal.3d 156, 160.)' (*People v. Glaser* (1995) 11 Cal.4th 354, 362; accord, *People v. Redd* (2010) 48 Cal.4th 691, 719.)" (*People v. Corrales* (2013) 213 Cal.App.4th 696, 699-700.)

## I. The Officers Did Not Detain Defendant When They Asked to See His Identification Card and He Handed It to Them

Defendant contends the officers detained him when they asked him for his identification card and retained it. For the following reasons, we do not agree.

### A. Case Law

"The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures of persons, including unreasonable investigative stops. (*Terry v. Ohio* (1968) 392 U.S. 1, 19 & fn. 16; *United States v. Sharpe* (1985) 470 U.S. 675, 682; see also *People v. Souza* (1994) 9 Cal.4th 224, 229.) With respect to seizures, '[a] seizure occurs whenever a police officer "by means of physical force or show of authority" restrains the liberty of a person to walk away.' (*People v. Souza*, *supra*, at p. 229, citing *Terry v. Ohio*, *supra*, at p. 19; see also *California v. Hodari D*. (1991) 499 U.S. 621, 625-626.)" (*People v. Vibanco* (2007) 151 Cal.App.4th 1, 8.)

In *People v. Jenkins* (2004) 119 Cal.App.4th 368 (*Jenkins*), the court considered the issue raised here—whether a seizure occurs when police officers ask for and receive a suspect's identification card. There, police officers received information that a woman named Lynn Jenkins was on parole for transportation of controlled substances. The officers knocked on a hotel room door and asked the woman who answered if she was Lynn Jenkins. She said she was. The officers then asked if she was on parole and to see her driver's license. When Jenkins went to retrieve the driver's license, the officers asked if they could search the room, to which Jenkins said, "yes." Both officers had entered the

room when Jenkins gave them her driver's license; while searching the bathroom, an officer saw an off-white crystalline substance, stipulated to be methamphetamine. (*Id.* at pp. 370-371.) Jenkins was arrested and charged with unlawful possession of a controlled substance. (*Id.* at p. 370.)

Jenkins moved to suppress the evidence, arguing that the "knock and talk" procedure employed by the officers violated her Fourth Amendment rights. The trial court granted the motion and dismissed the case. (*Jenkins*, *supra*, 119 Cal.App.4th at p. 370.) The Court of Appeal reversed, concluding that the "knock and talk" procedure did not require an articulable suspicion of criminal activity as a matter of law. (*Id.* at p. 372.) Instead, the proper inquiry was whether the officers' encounter with Jenkins was consensual. Because the trial court had not made a finding as to Jenkins's consent, the Court of Appeal remanded the matter to the lower court "for the limited purpose of determining whether the officers' conduct would have communicated to a reasonable person that he or she was not free to decline their requests to enter and search the motel room or otherwise terminate the encounter." (*Id.* at p. 374.)

This court reached a similar result in *People v. Terrell* (1999) 69 Cal.App.4th 1246 (*Terrell*). There, officers observed two men, one of whom seemed to be under the influence of a controlled substance, sitting on a park bench. An officer spoke briefly to the defendant and then asked whether he had any identification. Defendant responded by producing a California driver's license. The officer discovered defendant had an outstanding warrant and arrested him. Incident to his arrest, officers searched defendant and discovered a hypodermic syringe containing heroin. (*Id.* at p. 1251.) Defendant subsequently was convicted of possession of a controlled substance.

On appeal, defendant contended that his arrest was unlawful as the product of an illegal detention. The panel disagreed: "The totality of circumstances surrounding appellant's arrest reveals that appellant's initial encounter with the police was consensual, including appellant's spontaneous and voluntary action in handing Officer Trevino his driver's license. At no time did he ask the officer for his driver's license back. During the entire encounter, which lasted about three minutes, neither Officer Trevino nor his

8

partner, by words or conduct, indicated that appellant was not free to leave. No reasonable inference therefore could be drawn that the encounter was a detention rather than a consensual encounter. Appellant's counsel therefore had no factual basis for challenging the validity of the arrest as the product of an illegal detention, i.e., the temporary seizure of appellant without a reasonable suspicion that criminal activity was afoot and appellant was involved." (*Terrell*, *supra*, 69 Cal.App.4th at p. 1254; see also *People v. Lopez* (1989) 212 Cal.App.3d 289 (*Lopez*) [no reasonable suspicion required to ask defendant questions or request identification unless a reasonable person would not feel free to leave].)

Another court reached a different result in *People v. Castaneda* (1995) 35 Cal.App.4th 1222 (*Castaneda*). There, officers approached the defendant while he was seated in the passenger seat of an illegally parked car. One officer requested identification and asked who owned the car. The defendant handed the officer his identification card and said the car belonged to a friend. While one officer wrote a parking citation, the other ran a warrant check and learned there was an outstanding warrant for defendant's arrest. The officers arrested defendant and, incident to the arrest, found marijuana and cocaine in his pockets. (*Id.* at pp. 1225-1226.)

Defendant urged on appeal that the officers unreasonably detained him by running a warrant check. (*Castaneda*, *supra*, 35 Cal.App.4th at p. 1226.) The court agreed that defendant was detained once he relinquished his identification card: "Although Castaneda was not restrained by the officer asking for identification, once Castaneda complied with his request and submitted his identification card to the officers, a reasonable person would not have felt free to leave." (*Id.* at p. 1227.)[3]

---

[3] The court concluded that the detention was reasonable, however, because the officers reasonably suspected defendant was not being honest about the car's ownership, and they ran the warrant check simultaneously with a check of the car's ownership. (*Castaneda*, *supra*, 35 Cal.App.4th at p. 1227.)

9

*B.* *Analysis*

Each of the cases discussed above concludes that the Fourth Amendment is not implicated when a police officer asks to see an individual's identification card. They differ, however, on the constitutional implications if the individual complies with the request. *Castaneda* holds that a detention occurs once the individual relinquishes his or her identification card because, having done so, he or she would not feel free to leave. *Jenkins* and *Lopez* reach a different result, concluding that there is no detention so long as the card is voluntarily relinquished.

We think *Jenkins* and *Lopez* articulate the better rule. As one court has said, the *Castaneda* holding essentially "eviscerate[s] the rule that a law enforcement officer may ask an individual for identification without having any suspicion that he or she has committed a crime, because as soon as the individual complies with the constitutional request, an unconstitutional seizure will have occurred." (*Harrison v. City of Oakland* (N.D.Cal. 2008) 2008 U.S. Dist. LEXIS 95179, *13.) We agree: The right to *ask* an individual for identification in the absence of probable cause is meaningless if the officer needs probable cause to *accept* the individual's proof of identification. Moreover, we agree with the analysis of the Fourth Circuit Court of Appeals, that an individual's voluntary cooperation with an officer's request for identification does not convert the request into a detention because the individual is "free at this point to request that his [identification] be returned and to leave the scene." (*United States v. Analla* (4th Cir. 1992) 975 F.2d 119, 124, quoted in *People v. Bouser* (1994) 26 Cal.App.4th 1280, 1285.) We thus adopt the rule articulated in *Jenkins* and *Lopez* and hold that a voluntary relinquishment of one's identification card does not constitute a seizure as long as the encounter is consensual under the totality of the circumstances.

In the present case, the trial court concluded that defendant voluntarily complied with the officers' request for identification. This conclusion is supported by substantial evidence. The officers did not accuse defendant of any illegal activity when they first addressed him—they merely told him his car door was open and asked if the car belonged to him. They then asked for—but did not demand—identification. There is no

10

evidence that the officers used or threatened defendant with any physical force. Nor is there any evidence that, had defendant asked the officers to return his identification card to him, they would not have complied. Thus, the record supports the trial court's conclusion that a reasonable person in defendant's situation would have felt free to leave.

## II. In Any Event, Officers Had Reasonable Suspicion That Defendant Had Committed a Crime

In any event, even if officers detained defendant when they took his identification card, the detention was lawful because they reasonably suspected that he had committed a crime. As our Supreme Court has said, "[r]easonable suspicion is a lesser standard than probable cause, and can arise from less reliable information than required for probable cause." (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.) "'[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity.' (*In re Tony C.* (1978) 21 Cal.3d 888, 893, superseded on other grounds by Cal. Const., art. I, § 28.) In determining the lawfulness of a temporary detention, courts look at the '"totality of the circumstance" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.' (*United States v. Arvizu* (2002) 534 U.S. 266, 273; see also *People v. Souza* (1994) 9 Cal.4th 224, 239.)" (*Arburn v. Department of Motor Vehicles* (2007) 151 Cal.App.4th 1480, 1487.) Further, "'[law enforcement] officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to [him or her] that "might well elude an untrained person."'" (*People v. Corrales*, *supra*, 213 Cal.App.4th at p. 699.)

In the present case, officers had a reasonable suspicion that defendant had committed a crime. They had been informed that a robbery had been committed by two African-American men who appeared to be in their 20's, were driving a dark SUV, and had identified themselves as members of the 48th Street clique of the Rollin 40's street

11

gang. Minutes later, as the midnight hour approached, defendant, an African-American man in his early 30's, hastily parked a dark SUV in 48th Street clique territory just blocks from the crime scene and then exited the vehicle, leaving the rear passenger door open. The open rear door was consistent with the presence of a passenger who had hastily exited the vehicle. These facts gave rise to a reasonable suspicion that defendant had committed a crime and supported the officers' further investigation.

Defendant contends that the present case is analogous to *Williams*, *supra*, 168 Cal.App.3d 349. We do not agree. In *Williams*, an officer was on a routine patrol when he saw a white Monte Carlo sedan driven by the defendant on a residential street. Believing the ages and physical descriptions of the occupants and the vehicle matched recent broadcasts of local robberies he had heard over the police radio, the officer began following the vehicle. When he saw it roll through an intersection without stopping at a stop sign, he stopped the vehicle and conducted a field interview. He then searched the vehicle and discovered cocaine and two pistols. Defendant and the others were arrested and charged with cocaine possession. (*Id*. at pp. 353, 354-355.)

Defendant contended on appeal that the officer lacked sufficient cause to conduct an investigative detention, and the Court of Appeal agreed. It noted that neither defendant nor his passengers matched the description of the robbery suspects: "The officers' recollection of the 'Palmer' robbery was materially distorted. He selectively took off 20 years and a full beard from the description of one robber and reduced the 6-foot-3-inch, 249-pound robber to 'average-to-above-in-height-and-weight' to meet the general physical appearance of defendants. Neither [defendants] Williams nor Holmes was nearly so large and neither had any beard. The magistrate believed that Holmes looked more like 45 than 25 years old." (*Williams*, *supra*, 168 Cal.App.3d at p. 360.) Further, the robbers' car had been described as yellow, while defendant's was white. Such a distorted recollection, the court said, "may not serve as a valid basis for suspecting persons who coincidentally meet the conglomerate description. If such subjective editing of dispatch reports by the officer were allowed to justify the investigative detention of two black males who in fact bear no reasonable resemblance to

12

the actual separate descriptions broadcast, then police could by their own creativity manufacture cause to conduct an investigative detention upon an unconstitutionally broad range of persons who commit a traffic infraction in the area of recent serious crimes." (*Ibid*.)

Defendant contends that the facts of the present case are analogous to those of *Williams* because in both cases "the police had a slightly erroneous description of a vehicle, a vague and inaccurate description of the defendants (appellant was described only as a black male in his 20's and his co-defendant was described as wearing a *blue* Cardinals jacket), . . . and prior to the detention the police saw nothing in the vehicle or on the defendant's person, nor did the defendants say anything implicating themselves in a robbery." We do not agree. In *Williams*, the robberies had taken place at least a day before the suspects were arrested, while in the present case the robbery occurred just minutes before and just several blocks away from the location where defendant was stopped. Further, the description of the robbery suspects much more closely resembled defendant in the present case than was the case in *Williams*. Here, the robbery suspect was described to be an African-American man in his 20's (defendant was actually 32 years old); in *Williams*, the suspects were described to be in their mid-20's, while defendant Holmes "looked more like 45." (*Williams*, *supra*, 168 Cal.App.3d at p. 360.) Finally, in the present case the defendant's vehicle—a black SUV—closely matched the victim's description of the suspects' vehicle; in *Williams*, in contrast, the robbers had been described as driving a yellow sedan, while defendant's sedan was white. (*Id*. at p. 354.)

## DISPOSITION

The denial of the motion to suppress evidence and judgment of conviction are affirmed.

**CERTIFIED FOR PUBLICATION**


SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.