Filed 3/13/15  P. v. George CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GARY CHARLES GEORGE,<br><br>        Defendant and Appellant. | H040455<br>(Santa Clara County<br>Super. Ct. No. C1353527)<br><br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 23, 2015, be modified in the following particulars:

1.  On page 9, line 9 of the first full paragraph, the phrase "not a driver's license" is deleted so that the sentence reads as follows:

However, Deputy Galan testified both at the preliminary hearing and at the hearing on the suppression motion that defendant provided a California identification card.

2.  On page 9, following the fourth sentence of the first full paragraph, the following sentence is added:

She did not testify that defendant provided a driver's license.

3. On page 9, the following is added as a footnote to the sentence added by item No. 2 above:

Defendant points out that during the hearing on the motion to suppress, the prosecutor used the terms "license" and "driver's license." He argues that this amounted to a concession that defendant provided Deputy Galan with a driver's license rather than an identification card. However, the prosecutor did not make a formal stipulation on this point, and his statements are too ambiguous to constitute a concession. (See *People v. Acevedo* (2003) 105 Cal.App.4th 195, 200, fn. 8.)

4. On page 9, line 4 of the second full paragraph, the phrase "substantial evidence supports the trial court's determination" is deleted and replaced by the phrase "we conclude," so that the sentence reads as follows:

Under the circumstances here, we conclude that the encounter remained consensual even after Deputy Galan requested and obtained defendant's identification card.

5. On page 10, line 2, the phrase "substantial evidence supports the trial court's finding" is deleted and replaced by the phrase "we conclude," so that the sentence reads as follows:

Thus, we conclude that a reasonable person in defendant's position would have felt free to leave.

There is no change in judgment.

The petition for rehearing is denied.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

_____
MIHARA, J.

_____
GROVER, J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GARY CHARLES GEORGE,<br><br>    Defendant and Appellant. | H040455<br>(Santa Clara County<br>Super. Ct. No. C1353527) |

## I.  INTRODUCTION

After his motion to suppress evidence was denied, defendant Gary Charles George pleaded no contest to possession for sale of methamphetamine (Health & Saf. Code, § 11378) and transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), and he admitted six prior narcotics convictions (Health & Saf. Code, § 11370.2, subd. (c)) and one prior prison term (Pen. Code, § 667.5, subd. (b)).  The trial court imposed a blended sentence of three years in county jail and two years on mandatory supervision.  (See Pen. Code, § 1170, subd. (h)(5).)

On appeal, defendant contends the trial court erred by denying his motion to suppress evidence, claiming he was subjected to an unlawful detention and that he did not voluntarily consent to a search of his vehicle.  Defendant also contends the trial court improperly imposed a $50 per month probation supervision fee.  We will strike the probation supervision fee and affirm the judgment as modified.

II.    BACKGROUND

## A.    *The Search of Defendant's Vehicle*

On March 30, 2013, at about 2:45 a.m., Santa Clara County Sheriff's Deputy Jennifer Galan was in uniform, driving a marked patrol car in the area of McKean Road and Bailey Avenue, with a civilian ride-along.  The area was rural and very dark.  Deputy Galan saw a white pickup truck pulled over on the dirt shoulder of the road.  There were two occupants in the vehicle:  defendant, who was in the driver's seat, and a female, who was in the passenger seat.

Deputy Galan decided to do a welfare check.  She stopped her patrol vehicle in the roadway, illuminated the pickup truck with a spotlight, and turned on her patrol vehicle's rear amber lights in case a vehicle approached from behind.  She did not turn on her patrol vehicle's emergency lights.  Her patrol vehicle was stopped about five to six feet from the pickup truck, with its front bumper about even with the rear bumper of the pickup truck.  The pickup truck was not blocked from exiting to the roadway.

Deputy Galan approached the pickup truck with her flashlight illuminated.  She asked defendant and the passenger if they were okay or if anything was wrong. Defendant and the passenger indicated that everything was fine.  Deputy Galan asked if defendant "would mind" letting her see his identification.  Defendant said, "No problem," retrieved a valid California identification card from his wallet, and gave it to her.

Deputy Galan then asked defendant why he was there.  Defendant responded, "To enjoy the view."  This response made Deputy Galan suspicious, because from what she saw, "there [was] no view."  She asked if she could run defendant's identification. Defendant responded, "Go ahead."  Deputy Galan then contacted County Communications to run defendant's identification.

Deputy Galan learned that defendant "basically" had a suspended license, for failing to appear in traffic court.  She also ran the passenger's identification and determined that the passenger had an expired license.  Deputy Galan informed defendant

about the problem with his license and told him that he could not drive away. She asked if someone could come pick him up. Defendant said there was no one he could call.

Deputy Galan again asked defendant why he and the passenger were at that location. Defendant said, "To just get away." When Deputy Galan then asked "what they were really doing in that area," defendant and the passenger "gave two different responses," which raised an "alarm" for Deputy Galan. Deputy Galan then asked if they had "anything that they weren't supposed to have in the vehicle." Defendant looked around and said, "No, I don't think so."

Deputy Galan asked to search the vehicle. Defendant responded, "Well, I don't know. I don't like people going through my stuff." Deputy Galan again asked defendant if he had anything "he wasn't supposed to have in the vehicle." Defendant replied, "Well, no."

Deputy Galan again asked defendant if she could search the vehicle. When defendant said "that the last officer that searched his vehicle made a mess," Deputy Galan told him that she "would put everything back where [she] found it."

For a third time, Deputy Galan asked defendant if she could search the vehicle. Defendant replied, "Well, yes," opened his car door, and stepped out. He asked, "Well, where do you want me?" Deputy Galan directed him to the hood of her patrol vehicle and informed him that she was going to pat search him for weapons and then have him sit in the back of her patrol car. After defendant indicated that he understood, Deputy Galan conducted the pat search. Defendant then walked to the back of the patrol vehicle, opened the door, sat down, and closed the door. At that point, another deputy arrived. The second deputy stood with the passenger while Deputy Galan searched the pickup truck, in which she found baggies containing methamphetamine.

Deputy Galan used a calm tone of voice during her interaction with defendant. At no point did she inform defendant that he was not free to leave.

3

### B. *Charges, Suppression Motion, Pleas, and Sentence*

Defendant was charged with possession for sale of methamphetamine (Health & Saf. Code, § 11378; count 1) and transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 2). The information alleged that defendant had six prior narcotics convictions (Health & Saf. Code, § 11370.2, subd. (c)) and that he had served one prior prison term (Pen. Code, § 667.5, subd. (b)).

Defendant filed a motion to suppress evidence (see Pen. Code, § 1538.5), which was denied on September 10, 2013. Defendant subsequently pleaded no contest to both counts and admitted all of the prior conviction and prior prison term allegations.

On November 1, 2013, the trial court imposed a blended sentence of three years in county jail and two years on mandatory supervision. (See Pen. Code, § 1170, subd. (h).) The sentence consisted of the two-year lower term for count 2, a concurrent term for count 1, and a three-year consecutive term for one of the prior narcotics conviction allegations. The trial court struck the remaining prior conviction and prior prison term allegations. The trial court also imposed a $50 per month probation supervision fee.

## III.   DISCUSSION

### A. *Denial of Motion to Suppress*

Defendant contends the trial court erred by denying his motion to suppress, arguing that the search of his vehicle was the product of an unlawful detention. Defendant argues that he was unlawfully detained when Deputy Galan began questioning him. Alternatively, defendant asserts that he was detained when Deputy Galan took his identification card and conducted a warrants check. In either case, he contends his detention was unreasonable under the Fourth Amendment because it was not based upon reasonable suspicion that he was involved in criminal activity. Defendant additionally contends that he did not voluntarily consent to the search of his vehicle.

### 1. Proceedings Below

In his moving papers, defendant alleged that he was detained and searched without a warrant, and that the prosecution was obligated to justify the warrantless detention and search. (See *People v. Williams* (1999) 20 Cal.4th 119, 130.)

In response, the prosecution argued that there was a consensual encounter, not a detention, and that defendant had voluntarily consented to the search of his vehicle. The prosecution alternatively argued that Deputy Galan had reasonable suspicion to detain defendant based on the timing, location, and defendant's behavior.

Defendant filed a supplemental motion, arguing that he was detained after Deputy Galan used her spotlight and interrogated him, because he gave her his identification card in submission to her show of authority. Defendant argued that the encounter exceeded the scope of a welfare check and that any consent he gave for the search of his vehicle was invalid because it was tainted by the unlawful detention.

In denying defendant's motion to suppress, the trial court found there was not a detention: "The officer's conduct was – it was a consensual encounter and initially a welfare check, and then when that was dispelled, it did not become a detention. It continued to be a consensual encounter." The trial court indicated it was following the holding of *People v. Leath* (2013) 217 Cal.App.4th 344 (*Leath*), finding "that the asking for and receiving of identification does not amount to a detention." The trial court noted that Deputy Galan had not been aggressive or accusatory, that she had used a calm tone, and that her patrol vehicle had not blocked defendant's vehicle from exiting. The trial court further found that defendant had given voluntary consent to search his vehicle.

### 2. Standard of Review

"In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the

5

applicable law applies to the facts is a mixed question of law and fact that is subject to independent review.  [Citation.]"  (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

### 3. Analysis – Detention

"The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures of persons, including unreasonable investigative stops. [Citations.]"  (*Leath, supra,* 217 Cal.App.4th at p. 350.)  Before an officer can detain someone, there must be reasonable suspicion to believe that the person is engaged in criminal activity.  "[T]he temporary detention of a person for the purpose of investigating possible criminal activity may, because it is less intrusive than an arrest, be based on 'some objective manifestation' that criminal activity is afoot and that the person to be stopped is engaged in that activity.  [Citations.]"  (*People v. Souza* (1994) 9 Cal.4th 224, 230.)

"[A] detention does not occur when a police officer merely approaches an individual on the street and asks a few questions.  [Citation.]  As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur.  [Citations.]  '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'  [Citation.]  This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation.  [Citation.]  Circumstances establishing a seizure might include any of the following:  the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of

6

voice indicating that compliance with the officer's request might be compelled. [Citations.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

Defendant first contends that he was detained when Deputy Galan began asking him questions. Defendant contends the circumstances of the initial encounter would have been "deeply intimidating" to a reasonable person, who would not have felt free to leave. We conclude substantial evidence supports the trial court's determination that the initial encounter was consensual. Deputy Galan's actions were consistent with a welfare check on defendant's vehicle, which was parked on the side of a rural roadway in the middle of the night. When Deputy Galan pulled over to check on the vehicle, she parked behind defendant's vehicle, leaving room for him to drive away. (See *People v. Perez* (1989) 211 Cal.App.3d 1492, 1496.) Deputy Galan activated her rear amber lights, to provide a warning to vehicles approaching from behind, but she did not activate her emergency lights. (See *ibid.*) She illuminated defendant's vehicle with a spotlight and carried a flashlight, but this conduct "did not manifest police authority to the degree leading a reasonable person to conclude he was not free to leave." (See *ibid.* ["While the use of high beams and spotlights might cause a reasonable person to feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention."].) Finally, contrary to defendant's claim, Deputy Galan did not "interrogate" defendant and his passenger. She used a calm tone of voice, asked if anything was wrong, and asked if defendant "would mind" letting her see his identification. An officer does not need reasonable suspicion to ask about a person's welfare or to examine a person's identification, as long as the officer does not "convey a message that compliance with th[ose] requests is required." (*Florida v. Bostick* (1991) 501 U.S. 429, 435.)

Defendant next contends he was detained when Deputy Galan took his identification and ran a warrants check. Defendant acknowledges that requesting and examining identification does not necessarily result in a detention, but he argues that a person is effectively seized when an officer retains his or her identification.

7

Defendant's relies on *People v. Castaneda* (1995) 35 Cal.App.4th 1222 (*Castaneda*) to support his argument. In *Castaneda,* an officer approached the defendant, who was sitting in an illegally parked car, and requested his identification as well as information about the car's owner. The defendant provided his identification card to the officer, who then requested information about Castaneda via radio. Meanwhile, a second officer began filling out a parking citation. (*Id.* at p. 1226.) The officers learned that Castaneda had an outstanding arrest warrant, and a search incident to arrest revealed narcotics in Castaneda's pockets. (*Ibid.*)

On appeal, Castaneda claimed that he was unjustifiably detained. The court first observed that Castaneda was not detained when the officer first approached and began talking to him, nor when the officer requested his identification. (*Castaneda, supra,* 35 Cal.App.4th at p. 1227.) However, the court observed, "once Castaneda complied with [the officer's] request and submitted his identification card to the officers, a reasonable person would not have felt free to leave." (*Ibid*.) The court further noted that "once the officers began writing the parking ticket, *no one* would have tried to walk away from them." (*Ibid*.)

The Attorney General contends it is "somewhat ambiguous" as to whether the *Castaenda* case stands for the proposition that a detention occurs when a person hands his or her identification to an officer, "since the court there concluded that the defendant was detained once the officers began writing him a ticket." The Attorney General also points out that other courts have not followed *Castaneda*, including the court in *Leath*, which was cited by the trial court in the instant case.

In *Leath*, the appellate court held "that a voluntary relinquishment of one's identification card does not constitute a seizure as long as the encounter is consensual under the totality of the circumstances." (*Leath, supra,* 217 Cal.App.4th at p. 353.) The *Leath* court declined to follow *Castaneda*, explaining that "the *Castaneda* holding essentially 'eviscerate[s] the rule that a law enforcement officer may ask an individual for

identification without having any suspicion that he or she has committed a crime, because as soon as the individual complies with the constitutional request, an unconstitutional seizure will have occurred.' [Citation.]" (*Ibid*.) The *Leath* court further observed: "The right to ask an individual for identification in the absence of probable cause is meaningless if the officer needs probable cause to *accept* the individual's proof of identification. Moreover, . . . an individual's voluntary cooperation with an officer's request for identification does not convert the request into a detention because the individual is 'free at this point to request that his [identification] be returned and to leave the scene.' [Citation.]" (*Ibid.*)

Defendant contends that *Leath* is not applicable to the instant case because it involved a pedestrian encounter instead of a traffic encounter. He contends that while the *Leath* defendant could have walked away without his identification, "it would have been *illegal* for [defendant] to leave without his license." Defendant cites to Vehicle Code section 12951, which requires a person to "have the valid driver's license issued to him or her in his or her immediate possession at all times when driving a motor vehicle upon a highway." However, Deputy Galan testified both at the preliminary hearing and at the hearing on the suppression motion that defendant provided a California identification card, not a driver's license. Moreover, as the *Leath* court observed, defendant was free to request that his identification card be returned to him so that he could leave. (*Leath, supra,* 217 Cal.App.4th at p. 353.)

We agree with the *Leath* court that the totality of the circumstances must be considered and that a voluntary relinquishment of one's identification card does not necessarily constitute a seizure. (See *Leath, supra,* 217 Cal.App.4th at p. 353.) Under the circumstances here, substantial evidence supports the trial court's determination that the encounter remained consensual even after Deputy Galan requested and obtained defendant's identification card. Deputy Galan did not accuse defendant of any illegal activity, she did not demand his identification, she did not use or threaten any physical

9

force, and there is no evidence that she would not have complied if defendant had asked her to return his identification card to him. (See *ibid.*) Thus, substantial evidence supports the trial court's finding that, a reasonable person in defendant's position would have felt free to leave.

### 4. Analysis – Consent

Defendant claims that, contrary to the trial court's finding, he did not voluntarily consent to the search of his vehicle.

The Attorney General argues that this issue was not preserved for appeal. However, the issue of voluntary consent was raised in the prosecution's written opposition to defendant's motion to suppress. Also, in his supplemental motion to suppress, defendant argued that "any consent is invalid because it was tainted [by] Deputy Galan's improper conduct." Moreover, the trial court made an express finding that "the consent to search was voluntary." Having been raised and ruled on below, the issue was preserved for appellate review.

A search conducted pursuant to consent "is a constitutionally permissible and wholly legitimate aspect of effective police activity." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 228 (*Schneckloth*).) Consent to search must "not be coerced, by explicit or implicit means, by implied threat or covert force." (*Ibid.*) The determination of whether consent was coerced is made after "examining all the surrounding circumstances." (*Id.* at p. 229.)

Defendant contends his consent was coerced, based on the circumstances of the initial encounter as well as the fact that defendant consented only after Deputy Galan repeatedly asked for his consent.

Some courts have held that one factor in determining the voluntariness of consent to search is "whether [the defendant's] consent was immediate, or was prompted by repeated requests by the authorities." (E.g., *U.S. v. Sandoval-Vasquez* (7th Cir. 2006) 435 F.3d 739, 744.) Courts have also found that "persistent" requests to search following

a defendant's "unequivocal refusal to consent to a search" can render the consent involuntary. (E.g., *State v. Diede* (Minn. 2011) 795 N.W.2d 836, 848.) Here, however, defendant did not unequivocally refuse to consent when Deputy Galan initially asked if she could search the vehicle: he stated, "Well, I don't know," and he complained that he did not like "people going through [his] stuff." When Deputy Galan asked for consent a second time, defendant again equivocated: he stated that "the last officer that searched his vehicle made a mess." Deputy Galan responded by assuring defendant that she "would put everything back where [she] found it" and asked for consent again; defendant then replied, "Well, yes." Thus, this case is distinguishable from cases in which a defendant's unequivocal refusal to consent was overcome by an officer's repeated and persistent requests to search.

Considering "all the surrounding circumstances" of the encounter, the record contains substantial evidence to support the trial court's finding that defendant's consent to the search of his vehicle was voluntary. (See *Schneckloth, supra,* 412 U.S. at p. 229.) As noted above, defendant was not detained at the time Deputy Galan asked for his consent to search. (See *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1578 [consent was voluntary where defendant "was not under arrest, physically restrained, or threatened in any manner"].) Deputy Galan did not display any weapons or use any "force or authority" to obtain defendant's consent. (See *People v. Schoennauer* (1980) 103 Cal.App.3d 398, 409.) Deputy Galan used a calm tone of voice throughout the encounter, and she repeated her request for consent to search only after defendant gave equivocal responses. When defendant finally gave an unequivocal response, it was "Well, yes," and he exited his vehicle without being asked to do so. Substantial evidence thus supports the trial court's finding that defendant's consent was not obtained by coercive means.

11

## B.    *Probation Supervision Fee*

At the sentencing hearing held on November 1, 2013, the trial court imposed a $50 per month probation supervision fee.  (See Pen. Code, § 1203.1b.)  Defendant contends the fee must be stricken, pointing out that he was not placed on probation—rather, he was ordered to spend three years in custody, followed by two years of mandatory supervision under the 2011 Realignment Legislation.  (See Pen. Code, § 1170, subd. (h)(5)(B).)

The Attorney General concedes that the probation supervision fee was improper under the law at the time of defendant's sentencing.  However, the Attorney General contends that the fee is now proper because Penal Code section 1203.1b was recently amended to permit imposition of a mandatory supervision fee.

At the time of defendant's sentencing hearing, Penal Code section 1203.1b required the probation officer to determine the defendant's ability to pay "all or a portion of the reasonable cost of any probation supervision" (*id.*, subd. (a)), and it required the trial court to "order the defendant to pay the reasonable costs if it determines that the defendant has the ability to pay those costs" (*id.*, subd. (b)).  (Stats. 2009, ch. 606, § 6.)  However, the probation supervision fee did not apply to defendants who were placed on mandatory supervision under Penal Code section 1170, subdivision (h).  (*People v. Fandinola* (2013) 221 Cal.App.4th 1415, 1422.)

On September 19, 2014, the Governor signed into law Assembly Bill No. 2199, which became effective January 1, 2015, and which amended Penal Code section 1203.1b to apply to a defendant who "receives a term of mandatory supervision pursuant to subparagraph (B) of paragraph (5) of subdivision (h) of Section 1170." (Stats. 2014, ch. 468 (A.B. 2199), § 1.)

Contrary to the Attorney General's suggestion, we may not modify the probation supervision fee to reflect that it is a mandatory supervision fee, because neither fine was authorized at the time of defendant's sentencing hearing.  A sentence is unauthorized

12

"where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) As neither a probation supervision fee nor a mandatory supervision fee could have been lawfully imposed in defendant's case at the time of his sentencing hearing, we will strike the fee.

## IV.    DISPOSITION

The $50 per month probation supervision fee is stricken. As modified, the judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MIHARA, J.

_____
GROVER, J.