Filed 10/8/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICOLE THERESA LINN,<br><br>    Defendant and Appellant. | A145052<br><br>(Napa County<br>Super. Ct. No. CR169702) |

After the Napa County District Attorney filed a criminal complaint in Napa County Superior Court  charging defendant Nicole Theresa Linn with misdemeanor driving under the influence of alcohol, defendant filed a motion under Penal Code section 1538.5 to suppress the evidence upon which the People relied.  She contended she had been unlawfully detained prior to the police obtaining this evidence in violation of her Fourth Amendment rights against unlawful search and seizure.  The trial court, a court commissioner presiding, agreed and granted her motion.  The appellate division of the superior court reversed this decision, concluding defendant's encounter with the police officer who arrested her was consensual up to the time that he reasonably suspected she had been driving under the influence.

The appellate division certified the case for transfer to this court to resolve a conflict among our appellate courts regarding the significance of a police officer taking a person's voluntarily offered identification card in evaluating whether their encounter is consensual or a detention.  We ordered the case transferred.  We agree with the appellate division's rejection of a bright-line rule about an officer's taking of a voluntarily offered identification card.  However, substantial evidence indicates that the officer's actions reviewed in their totality constituted an assertion of his coercive authority before he had

1

any reasonable suspicion to detain defendant. These actions included his stopping within three feet of defendant as she exited her vehicle to, as he told her, talk with her about her passenger's flicking ashes out of the vehicle's window as defendant drove, asking her for her driver's license without explanation as he commanded her to put out her cigarette and put down her soda can, retaining her driver's license as he conducted an unexplained record check, and questioning of the passenger for personal details that the officer recorded on a form. No objectively reasonable person would believe she was free to end this encounter under the totality of these circumstances, regardless of the officer's polite demeanor and relatively low-key approach. We reverse the appellate division's decision and affirm the trial court's order granting defendant's suppression motion on the ground that she was unlawfully detained before the officer had a reasonable suspicion that she had been driving under the influence.

## BACKGROUND

In February 2014, the Napa County District Attorney filed a criminal complaint charging defendant with one count each of misdemeanor driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)) and misdemeanor driving with a blood alcohol concentration of 0.08% or higher (Veh. Code, § 23152, subd. (b)). Defendant pled not guilty to both counts.

## I.

### *Defendant's Motion to Suppress*

In May 2014, defendant filed her suppression motion, which the People opposed, and a hearing was held, presided over by a court commissioner. At the onset, the People stipulated defendant was detained without a warrant; therefore, as the court then noted, it was the People's burden to justify the detention. The People did so by arguing the encounter was consensual up to the time the arresting officer, City of Napa Police Department Officer Thomas Helfrich, reasonably suspected defendant was driving under the influence of alcohol. Helfrich testified, a video recording of a part of the encounter captured on his body camera was admitted into evidence and played, and defendant

2

testified on her own behalf.  After this presentation of evidence and argument by counsel, the trial court granted the motion.[1]

## A. Officer Helfrich's Testimony

Officer Helfrich testified that he was on patrol in Napa dressed in full uniform, riding on a marked police motorcycle on the morning of January 29, 2014.  While stopped at Division and Franklin Streets facing west, he saw a Ford Expedition[2] with a driver and passenger inside turn left onto westbound Division Street.  The passenger held what appeared to be a lit cigarette out an open window and Helfrich "just saw a quick flick of the fingers, which appeared to be he was flicking the ashes out the window."  Helfrich understood the passenger's action violated the Vehicle Code.

Helfrich said he drove toward the Expedition, which had parked in a parking stall on Division Street before he reached it.  He stopped "next to the car," parked his motorcycle "approximately three feet, maybe more, from the driver side door area," and got off his motorcycle as the defendant driver and the passenger were getting out of the Expedition.  Helfrich did not turn on lights or sirens, block defendant's pathway, display his weapon, or comment about whether the two were free to leave.

Helfrich said he contacted the passenger and spoke to defendant, who stood near him by the driver side compartment of the Expedition.  He told defendant "[t]he reason for my contact was because . . . the passenger . . . was flicking ashes out of the window."  He asked the passenger "[w]hy he was flicking ashes out the window, what his name was, . . . general information."  The passenger responded to Helfrich's question about flicking the ashes, " 'I don't know.' "

---

[1]  Ordinarily, we state the facts in the light most favorable to the trial court's ruling.  (*People v. Berkeley* (1978) 88 Cal.App.3d 457, 459, fn.1.)  In this case the facts were undisputed with one exception (whether or not Helfrich told defendant to stay where she was) that is not consequential to our analysis.

[2]  The reporter's transcript indicates Helfrich referred to defendant's vehicle both as an Explorer and an Expedition.  For clarity's sake, we refer to it as an Expedition, which was how defendant identified it in her testimony.

3

On direct examination, Helfrich said he turned on his body camera "[r]ight after" getting off his motorcycle, and a portion of the resulting video was then played and admitted into evidence. Helfrich said he "had a brief conversation with [defendant]" and "started smelling alcohol coming from her" within a minute. On redirect, however, he revised this time estimate, saying he first noticed defendant smelled of alcohol "[o]ver two minutes" after he first stopped her.

Helfrich said that when he smelled alcohol he asked defendant if she had been drinking and she suggested he was smelling her perfume. He checked her horizontal gaze nystagmus, asked her questions about her drinking, administered a breath test, concluded she had been driving while under the influence and arrested her.[3]

On cross-examination, Helfrich acknowledged that he might have asked defendant questions before he turned on his body camera. He said it was a safe assumption that he asked her name and to see her driver's license before turning on his body camera because he asked those questions and neither was on the video recording. He also said that when defendant offered her license to him, he took it and held it in his hand as he called dispatch and ran a record check on defendant. These events are not depicted on the video recording either.

Helfrich also testified on cross-examination that defendant did not get out of the Expedition in response to any request by him or try to walk away, and that he did not tell her not to go anywhere. He could not recall if she was smoking a cigarette, but said if she was, he would have told her to put it out since he "always tell[s] people to put out their cigarettes." He took down the passenger's personal information and ran a records check on him, but did not write a citation for him or defendant. Helfrich did not believe that defendant had violated any Vehicle Code section.

---

[3] The parties did not dispute the propriety of defendant's detention and arrest once Helfrich smelled alcohol. They focused at the hearing and focus in this appeal on the events that occurred before he did so.

4

## B. Defendant's Testimony

Defendant testified that she parked her Ford Expedition and was getting out when she first saw Helfrich, who was sitting on a motorcycle parked right next to her car. The first thing he said to her was that he "noticed my passenger flicking ashes out the window." He asked for her driver's license. She was smoking and drinking a can of soda, and Helfrich "asked me to put [the cigarette] out" and "put [the can] down."[4] He did not turn on his emergency lights or siren, use a blow horn, raise his voice or block her path.

When asked whether she tried to walk away from Helfrich at any point, defendant answered "[n]o," but stated that "he wouldn't let me walk off." She then testified that she "tried to walk away when I got out of my vehicle" and that Helfrich "asked me to stand there, stay there." In response to further questioning, she clarified that she turned to walk away after Helfrich asked for her driver's license, told her to put out her cigarette and put down her soda, and started talking to her passenger. He then told her to stay where she was.

## C. The Body Camera Video Recording

The reporter's transcript of the hearing indicates that during Helfrich's testimony, the first three minutes and forty-six seconds of his body camera video recording was played for the court and admitted into evidence as People's Exhibit 1. We have obtained this exhibit from the superior court and taken judicial notice of the video segment that was admitted into evidence.

At first on this recording, a police motorcycle can be seen in the left-hand part of the screen, parked at a diagonal a few feet from a vehicle, on the vehicle's driver's side and towards its front. A voice—apparently Helfrich's—asks a man smoking a cigarette standing about five to ten feet in front of the motorcycle—apparently the passenger— why he flicked cigarette ashes out the window. The passenger says he does not know.

---

[4] The People did not dispute these facts. Helfrich testified only that he did not recall whether defendant was smoking or drinking soda, and that his practice was to tell individuals who were smoking to put out their cigarettes.

When Helfrich asks him if he had an ashtray, the passenger turns to a woman—apparently defendant—who is perhaps two feet from Helfrich standing by the open driver's side door. Soon thereafter, Helfrich can be seen filling out a form while asking the passenger his date of birth and middle name, and can be heard calling someone on his police radio.

Helfrich then turns to defendant and says, "I'm smelling alcohol right now." Defendant reaches into her car, turns and shows him a bottle of pink liquid and suggests he is smelling it. He indicates he is not.

Helfrich continues with his police radio call, in which he states the passenger's name and birth date. He asks the passenger for his residence address, his driver's license number, whether he indicates he is "Hispanic" or "White" on applications, his height and weight, and writes the passenger's answers on the form. Helfrich then tells defendant to stand next to him, checks her eyes and investigates her sobriety.

## D. The Arguments

Defense counsel argued that Helfrich's conduct up until when he smelled alcohol constituted an illegal detention without reasonable suspicion or probable cause. This included that he asked defendant to identify herself and for her driver's license, ran a records check, and told her to put out her cigarette, put down her soda and stay where she was. Said defense counsel, "[T]his is most certainly a situation where [defendant] is no longer free to walk away, and she's being restrained without reasonable suspicion or probable cause." Defense counsel cited *People v. Castaneda* (1995) 35 Cal.App.4th 1222 (*Castaneda*) as holding that once an officer takes possession of an individual's identification "that person is no longer free to leave."

The prosecution argued that an officer needed no reasonable suspicion of a crime to approach someone in a public place and ask questions, and that this is "exactly what the officer did here." She cited *United States v. Mendenhall* (1980) 446 U.S. 544 (*Mendenhall*) and *People v. Gonzales* (1985) 164 Cal.App.3d 1194 (*Gonzales*) as holding that police may "ask for identification and hold onto it." She argued that the absence of such factors as the "threatening presence of several officers, displaying of a weapon,

6

physical touching, language or tone indicating that compliance is compelled" demonstrated that this was a consensual encounter rather than a detention. She noted defendant "parked her vehicle on her own volition" and Helfrich testified he did not tell her to go anywhere or block her path as further factors indicating the encounter was consensual. In the alternative, she argued, Helfrich had reasonable suspicion to detain defendant because he believed there had been a Vehicle Code violation, as Vehicle Code section 23111 prohibits a person in a vehicle from throwing onto a road a lighted or unlighted cigarette.

### E. The Trial Court's Ruling

The trial court noted that Helfrich saw *the passenger* flicking ashes, and found Helfrich did not conduct a traffic stop because he "didn't stop the vehicle" and contacted defendant and the passenger only after they "were out of the vehicle." Therefore, the court determined, "we are not talking about initiating a stop." The court did not think "that the passenger having being suspected of flicking ashes would justify detaining the defendant" under these circumstances. "So, the question is whether it was a detention of [defendant] versus consensual contact with her."

Counsel and the court discussed the significance of *Castaneda*, *supra*, 35 Cal.App.4th 1222, which held that Castaneda was detained when an officer took his voluntarily given driver's license. (*Id*. at p. 1227.) The prosecutor then cited various factors that courts have considered in determining whether or not a person's encounter with police is consensual. The court responded:

"Those are factors. But *Castaneda* is saying that holding the license and running the check is a definitive factor that equals a detention whether or not you have those other factors.

"You know, we do also in this case have the commands of putting out the cigarette, and which the officer didn't testify to, but he did say that was his practice. So, that leads me to find the defendant credible in her testimony in that regard.

"I think I'm prepared to rule on this that this was not a stop. I mean the officer pulled over at the same time they did. [Defendant] didn't pull over as a result of the

7

officer directing her to do so.  He would have been justified in the doing that, but that's not what happened.

"He contacted . . . defendant as she was exiting her vehicle.  And he did not suspect her of committing a crime, of violating the Vehicle Code.  He had no suspicion of her doing something wrong upon that initial contact.

"And it was initially probably consensual.  But once he asked for the ID or once he had her ID and was running the records check, it was no longer consensual, pursuant to *Castaneda* it was a detention.  And that was prior to him smelling alcohol.  So, there was not a justification for that detention, albeit a short one.

"So, I have to find that . . . portion of it was not justified.  So, I'll have to grant the motion to suppress on that basis."

## II.

### *The Appellate Division's Reversal*

The People timely appealed the court's ruling to the appellate division of the superior court.  The appellate division issued a six-page opinion in which it reversed the ruling.  After interpreting the court's findings as that defendant's encounter was consensual up until the time she gave Helfrich her driver's license, it characterized the issue as "whether the consensual encounter became a detention once Officer Helfrich had possession of Defendant's driver's license based on the holding of *Castaneda* . . . ."  It reversed, relying heavily on *People v. Leath* (2013) 217 Cal.App.4th 344 (*Leath*), which disagreed with *Castaneda* and held there was not necessarily a detention when a person voluntarily relinquished identification to police.

Defendant filed a request for certification of the case for transfer to this court pursuant to California Rules of Court, rule 8.1005(a)(1), based on the split in appellate authority between *Castaneda* and *Leath*.  The appellate division granted her request.  On May 14, 2015, we ordered the case transferred pursuant to California Rules of Court, rule 8.1008(a)(1)(A).

8

# DISCUSSION

## I.

### *Standard of Review*

When a defendant moves to suppress evidence, he or she "must set forth the factual and legal bases for the motion . . . by making a prima facie showing that the police acted without a warrant. The prosecution then has the burden of proving some justification for the warrantless search or seizure, after which the defendant can respond by pointing out any inadequacies in that justification." (*People v. Williams* (1999) 20 Cal.4th 119, 136.)

Where, as here, a case is certified for transfer to this court in order to settle important and recurring questions of law, we have the same power to review any matter and make orders as the superior court's appellate division. (Cal. Const., art. VI, § 11; Code Civ. Proc., § 911; see *People v. Niebauer* (1989) 214 Cal.App.3d 1278, 1284.) Therefore, our review is as if the parties directly appealed from the trial court ruling on defendant's suppression motion. (*People v. Niebauer*, *supra*, 214 Cal.App.3d at p. 1284.)

We consider the evidence in the light most favorable to the trial court's suppression motion ruling. (*People v. Woods* (1999) 21 Cal.4th 668, 673–674 (*Woods*).) "As the finder of fact in a proceeding to suppress evidence (Pen. Code § 1538.5), the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*Id*. at p. 673.) "The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the Constitution. Although that issue is a question of law, the trial court's conclusion on the point should not lightly be challenged by appeal . . . . Of course, if such review is nevertheless sought, it becomes the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*People v. Lawler* (1973) 9 Cal.3d 156, 160, fn. omitted.)

Accordingly, we consider the record in the light most favorable to defendant as respondent "since 'all factual conflicts must be resolved in the manner most favorable to

9

the [superior] court's disposition on the [suppression] motion.' " (*Woods*, *supra*, 21 Cal.4th at p. 673.)  "But while we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, we exercise our independent judgment in determining the legality of a search on the facts so found." (*Id.* at pp. 673–674.)

## II.

### *Law Governing Consensual Encounters and Detentions*

Under California Constitution, article I, section 28, subdivision (d), we apply federal constitutional standards in deciding motions to suppress based on claims of illegal search and seizure.  (*Woods*, *supra*, 21 Cal.4th at p. 674.)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive:  consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty.  [Citations.] . . . Consensual encounters do not trigger Fourth Amendment scrutiny.  [Citation.]  Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)  "An officer may approach a person in a public place and ask if the person is willing to answer questions.  If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution." (*People v. Brown* (2015) 61 Cal.4th 968, 974, citing *Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Bostick*) and *Florida v. Royer* (1983) 460 U.S. 491, 497 (plur. opn. of White, J.) (*Royer*).)  A detention, on the other hand, is a seizure, albeit a limited one, for which reasonable suspicion is required.  (See, e.g., *People v. Souza* (1994) 9 Cal.4th 224, 231.)

A detention occurs when an officer intentionally applies physical restraint or initiates a show of authority to which an objectively reasonable person innocent of wrongdoing would feel compelled to submit, and to which such a person in fact submits. (*People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1367, citing *California v. Hodari D.* (1991) 499 U.S. 621, 626; *Brower v. Inyo County* (1989) 489 U.S. 593, 596–597; *Bostick,*

10

*supra*, 501 U.S. 429, 434, 437–438; and *INS v. Delgado* (1984) 466 U.S. 210, 215, 218.) "In situations involving a show of authority, a person is seized 'if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," ' or ' "otherwise terminate the encounter" ' ([*Brendlin v. California*, *supra*, 551 U.S. at p. 255]), and if the person actually submits to the show of authority (*id*. at p. 254)." (*People v. Brown*, *supra*, 61 Cal.4th at p. 974.) The test for the existence of a show of authority is an objective one and thus, "[n]either the officer's uncommunicated state of mind nor the subjective belief of the individual citizen is relevant to the determination of whether a police contact is a detention." (*In re Christopher B.* (1990) 219 Cal.App.3d 455, 460.)

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (*Mendenhall*, *supra*, 446 U.S. at p. 554; *People v. Terrell* (1999) 69 Cal.App.4th 1246, 1254 (*Terrell*).) Our case law indicates that other relevant factors include the time and place of the encounter, whether the police indicated the defendant was suspected of a crime, whether the police retained the defendant's documents, and whether the police exhibited other threatening behavior. (See, e.g., *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790; *People v. Garry* (2007) 156 Cal.App.4th 1100, 1110–1112; *Castaneda*, *supra*, 35 Cal.App.4th at p. 1227; *People v. Spicer* (1984) 157 Cal.App.3d 213, 218–220.)

Questions by an officer of a sufficiently accusatory nature may "be cause to view an encounter as a nonconsensual detention." (*People v. Lopez* (1989) 212 Cal.App.3d 289, 292 (*Lopez*).) The same is true for commands or directions issued in the course of an encounter. (*People v. Aldridge* (1984) 35 Cal.3d 473, 476–477 [officer's order that four individuals put down their packages and stand next to the patrol car constituted a detention]; *Barber v. Superior Court* (1973) 30 Cal.App.3d 326, 330

11

[officer detained a man by telling him to wait in his car while warrant checks were being run].)

The United States Supreme Court has made clear that, in determining whether an encounter is consensual or constitutes a detention, a court should consider *the totality of the circumstances* rather than adopt any per se rules about particular facts. (*Bostick*, *supra*, 501 U.S. 429.) A court should consider all the circumstances surrounding the encounter to decide whether an objectively reasonable person, who is innocent of wrongdoing, would have believed he or she was free to go. (*Mendenhall*, *supra*, 446 U.S. at p. 554; *Bostick*, *supra*, 501 U.S. at pp. 437–438.) "Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.) The Supreme Court has emphasized that "for the most part *per se* rules are inappropriate in the Fourth Amendment context. The proper inquiry necessitates a consideration of 'all of the circumstances surrounding the encounter.' " (*United States v. Drayton* (2002) 536 U.S. 194, 201.)

In short, there is "no 'bright-line' distinction between a consensual encounter and a detention . . . . 'The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.' " (*People v. Verin* (1990) 220 Cal.App.3d 551, 556, citing *Michigan v. Chesternut*, *supra*, 486 U.S. at p. 573.) There is not "a litmus-paper test for distinguishing a consensual encounter from a seizure," but, rather "[t]here will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." (*Royer*, *supra*, 460 U.S. at pp. 506-507.)

12

## III.

### *When an Officer Takes a Person's Voluntarily Offered Identification*

The United States Supreme Court has made clear that "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." (*Hiibel v. Sixth Judicial Dist. Ct.* (2004) 542 U.S. 177, 185.) Similarly, "[a]sking for and examining . . . [one's] driver's license [is] no doubt permissible." (*Royer*, *supra*, 460 U.S. at p. 501; see also *Gonzales*, *supra*, 164 Cal.App.3d at p. 1197 [officer "abridged no constitutional tenet by *asking* Gonzales for his driver's license and identification"].)

However, as the appellate division of the superior court noted, there has been some confusion regarding whether an officer's *taking* of a voluntarily offered identification, such as a driver's license, transforms a consensual encounter into a detention.

On the one hand, in *Castaneda*, *supra*, 35 Cal.App.4th 1222, the case relied on by the trial court to grant defendant's suppression motion, the appellate court concluded that an officer's taking of a person's identification card itself created a detention. A police officer contacted Castaneda as he sat in the passenger seat of an illegally parked car, requested identification from him and asked him who owned the car. (*Id*. at pp. 1225–1226.) Castaneda handed the officer his identification card and said a friend who lived in a nearby apartment owned the car, although he did not know more about the friend's whereabouts. (*Id*. at p. 1226.) The officer radioed for information about the car's registration and about Castaneda while another officer filled out a parking citation for the car. (*Ibid*.) The officers learned there was an outstanding warrant for Castaneda's arrest, arrested him and found marijuana and cocaine in his pockets during a personal search incident to the arrest. (*Ibid*.)

The magistrate rejected Castaneda's argument that he was unreasonably detained during the warrant check. (*Castaneda*, *supra*, 35 Cal.App.4th at p. 1226.) The appellate court concluded that Castaneda *was* detained prior to the officers learning about his outstanding arrest warrant because, "[a]lthough [he] was not restrained by the officer

13

asking for identification, once [he] complied with his request and submitted his identification card to the officers, a reasonable person would not have felt free to leave. And once the officers began writing the parking ticket, *no one* would have tried to walk away from them." (*Id*. at p. 1227.)[5]

The trial court here characterized *Castaneda* as indicating that an officer's taking of a voluntarily offered identification card was a "definitive factor" in establishing that a detention had occurred. To be fair, *Castaneda* does not use such terminology, and its ultimate conclusion that a detention occurred relied also on the officer's writing of a parking citation. To the extent it might be interpreted as turning solely on the taking of the identification, such an approach amounts to a "litmus-paper test" approach that conflicts with the "totality of the circumstances" paradigm that the United States Supreme Court has instructed courts to apply in such cases. (See *Bostick*, *supra*, 501 U.S. 429.)

The impropriety of such a "litmus-paper test" approach is made clear by cases cited by the People that have considered whether or not an officer's taking of a voluntarily offered identification card constituted a detention, all three of which have concluded that it did not. The most relevant of these is *Leath*, *supra*, 217 Cal.App.4th 344, on which the appellate division relied heavily to reverse the trial court's grant of defendant's suppression motion. In *Leath*, two police officers investigating a robbery spotted a vehicle near the scene of the crime matching a description of the robbers' vehicle. (*Id*. at p. 348.) The officers approached Leath and one said, " 'Hey, sir, you left your rear door open.' " (*Ibid.*) Leath responded, " 'Oh, oh, shit, I did,' " and walked back toward the car. (*Ibid.*) In response to further questions, he said it was his car and that he was near his friend or cousin's house. (*Ibid.*) An officer asked Leath his name and if he had any identification, whereupon Leath handed the officer his identification card. (*Ibid.*) The officers ran defendant's name through their database and discovered

---

[5] Nonetheless, the appellate court concluded that the officers had reasonable suspicion that justified Castaneda's detention. (*Castaneda*, *supra*, 35 Cal.App.4th at pp. 1227–1228.)

14

outstanding traffic warrants, at which point they arrested him. (*Ibid.*) The trial court subsequently denied Leath's suppression motion, and he was convicted of two counts of second degree robbery. (*Id.* at pp. 349–350.)

The *Leath* court reviewed prior cases that addressed the issue and expressly disagreed with *Castaneda*. (*Leath*, *supra*, 217 Cal.App.4th at pp. 351–354.) It concluded that Leath's voluntary turning over of his identification to police did not convert his encounter with them into a detention because he was " 'free at this point to request that his identification be returned and to leave the scene.' " (*Id.* at 353.) The court reasoned that "[t]he right to ask an individual for identification in the absence of probable cause is meaningless if the officer needs probable cause to *accept* the individual's proof of identification." (*Ibid.*) It opined that "the *Castaneda* holding essentially 'eviscerate[s] the rule that a law enforcement officer may ask an individual for identification without having any suspicion that he or she has committed a crime, because as soon as the individual complies with the constitutional request, an unconstitutional seizure will have occurred.' " (*Ibid.*) The *Leath* court concluded that, given that the officers in the case did not accuse Leath of any illegal activity when they first addressed him, demand identification, or threaten Leath with any physical force, and given that there was no evidence that they would not have returned the defendant's identification if he had asked for its return, the record supported the trial court's conclusion that a reasonable person in defendant's position would have felt free to leave prior to the officers' discovery of the defendant's outstanding traffic warrants. (*Ibid.*)

The appellate court reached a similar result in *Terrell*, *supra*, 69 Cal.App.4th 1246. Two police officers observed Terrell and two other men seating on a park bench, and one of the other men appeared to be under the influence of a controlled substance. (*Id.* at p. 1251.) One of the officers spoke briefly to Terrell and asked whether he had any identification. Terrell produced a California driver's license and the officers discovered he had an outstanding warrant. They arrested him and, incident to the arrest, searched him and discovered a hypodermic syringe containing heroin. (*Ibid.*) The

15

trial court denied Terrell's suppression motion, and he was later convicted of possession of a controlled substance. (*Id.* at p. 1250.)

On appeal, Terrell argued that he had been unlawfully detained prior to his arrest. The court disagreed: "The totality of circumstances surrounding [Terrell's] arrest reveals that [his] initial encounter with the police was consensual, including [his] spontaneous and voluntary action in handing [the officer] his driver's license. At no time did he ask the officer for his driver's license back. During the entire encounter, which lasted about three minutes, neither [officer] nor his partner, by words or conduct, indicated that [Terrell] was not free to leave. No reasonable inference therefore could be drawn that the encounter was a detention rather than a consensual encounter." (*Terrell*, *supra*, 69 Cal.App.4th at p. 1254.)

Finally, in *Lopez*, *supra*, 212 Cal.App.3d 289, a veteran police officer and a recruit were patrolling a parking lot for narcotics traffickers when they saw Lopez, whom the officer thought he recognized from a previous encounter, sitting on the hood of a car. As he walked by Lopez, the officer asked him if it was his car and Lopez said it was not. In the course of further conversation, Lopez said he was waiting for his friends to play pool and the officer asked why he had no pool stick, to which Lopez had no reply. The officer then asked if Lopez had identification. Lopez reached into his pocket and handed his wallet to the recruit; when the wallet was opened, evidence of cocaine " 'pop[ped] up' " and the officers arrested him. (*Id.* at p. 291.)

The trial court concluded that the police were required to have a reasonable suspicion in order to ask questions or request identification. The appellate court disagreed and reversed. It focused on two concerning aspects of the encounter: the officer's initial questions of Lopez and his request for identification. The court dismissed its concern about the latter quickly based on United States Supreme Court case law. (*Lopez*, *supra*, 212 Cal.App.3d at p. 292.) It acknowledged, however, that, "questions of a sufficiently accusatory nature may by themselves be cause to view an encounter as a nonconsensual detention." (*Ibid.*) The court's discussion indicated that it considered the question close in this case. It noted, "Lopez was not engaged in any apparently unlawful

16

conduct, yet the officers stood on either side of him and launched into a short, albeit somewhat accusatory, interrogation." (*Id*. at p. 293.) Nonetheless, the court concluded that the particular questions asked did not create a detention because "the questions were brief, flip, and, most importantly, did not concern criminal activity." (*Ibid*.)

The People cite another case that is relevant to the present circumstances, *People v. Bouser* (1994) 26 Cal.App.4th 1280. The defendant, Bouser, argued in a suppression motion that he was unlawfully detained when a police officer asked for his identification information and conducted a warrant check before arresting Bouser. The appellate court affirmed the trial court's rejection of the motion. It concluded that it was "reasonable to presume the check alerted Bouser that he was somehow being investigated" and that the officer's questions to Bouser would cause a reasonable person to believe they were the subject of "general suspicion." (*Id*. at p. 1287.) However, "neither the questioning nor the warrant check related to specific and identifiable criminal activity" and the officer, among other things, "did not order Bouser to do anything or turn over anything to him to hold while the brief check was completed." (*Ibid*.)

*Lopez* does not discuss the "totality of the circumstances" paradigm because it was decided before the Supreme Court made clear the necessity of this paradigm's application in *Bostick*, *supra*, 501 U.S. 429. However, *Leath*, *Terrell* and *Bouser* make clear their conclusions are based on a review of all the circumstances pursuant to *Bostick*. (*Leath*, *supra*, 217 Cal.App.4th at p. 353 ["a voluntary relinquishment of one's identification card does not constitute a seizure as long as the encounter is consensual under the totality of the circumstances"]; (*Terrell*, *supra*, 69 Cal.App.4th at p. 1254 [stating that "[t]he totality of circumstances surrounding [Terrell's] arrest reveals that [his] initial encounter with the police was consensual, including [his] spontaneous and voluntary action in handing [the officer] his driver's license," that Terrell never asked for his license back, and that neither officer nor his partner, "by words or conduct, indicated that [Terrell] was not free to leave"]; *Bouser*, *supra*, 26 Cal.App.4th at p. 1287 [refusing to adopt Bouser's proposed "bright line rule" and considering the "warrant check a single circumstance that must be viewed in light of the other facts presented"].)

17

Taken together, these cases establish that an officer's taking of a voluntarily offered identification card, while it may be considered as a factor in evaluating whether a detention has occurred pursuant to a review of all the circumstances involved in an encounter, is not alone definitive in resolving that question. To the extent the trial court may have concluded otherwise, it was in error. This, however, does not satisfy our obligation to determine whether, under the totality of the circumstances, an unlawful detention occurred here. We turn now to this question.

## IV.

### *The Totality of the Circumstances Indicate Linn Was Unlawfully Detained.*

The sole question here is whether the totality of the circumstances supports the trial court's determination that Helfrich unlawfully detained defendant prior to smelling alcohol on her; that is, was the trial court correct in concluding that under the totality of the circumstances here, an objectively reasonable person would not have felt free to terminate the encounter prior to that time?[6] We agree with and thus affirm the trial court's holding that Helfrich unlawfully detained defendant.

Pursuant to *Bostick* and our deferential standard of review of the record in favor of the judgment (*Woods*, *supra*, 21 Cal.4th at pp. 673-674), we must consider all of the circumstances involved in this encounter. The analyses, although not the conclusions, contained in the cases that we have just discussed—*Leath*, *Terrell*, *Lopez* and *Bouser*—refer to the absence of other factors that could contribute to a determination that a detention occurred. Several of these factors are present here. These include that

---

[6] We reject the People's contention, as an alternative ground in favor of rejecting defendant's suppression motion, that Officer Helfrich was justified in detaining defendant because he had a reasonable suspicion that there was a violation of Vehicle Code section 23111 and, therefore, properly stopped defendant's vehicle in order to investigate the passenger's conduct. A violation of section 23111 may have justified a detention of the passenger, but it has no relevance to Helfrich's encounter with defendant because he contacted her after she had parked her car and gotten out of it. As the trial court concluded, there is no evidence whatsoever that Helfrich stopped the vehicle and the People offer none to cause us to question this finding. Their alternative argument is meritless and need not be discussed further.

18

Helfrich's first statement to defendant, intended to explain why he was talking to her, implicated her in the illegal activity of her passenger. (See *Leath*, *supra*, 217 Cal.App.4th at p. 353; *Lopez*, *supra*, 212 Cal.App.3d at p. 293; *Bouser*, *supra*, 26 Cal.App.4th at p. 1287 [all indicating that the questioning was not directed at the defendant's possible illegal activity].) Also, Helfrich "commanded" defendant, as the trial court characterized it, to put out her cigarette and put down her soda can,[7] thereby indicating that she was not free to do as she pleased. (See *Terrell*, *supra*, 69 Cal.App.4th at p. 1254; *Bouser*, *supra*, 26 Cal.App.4th at p. 1287 [emphasizing that the defendants were not ordered to do anything].)[8]

In addition, the undisputed evidence indicates that Officer Helfrich approached defendant in full uniform by parking his marked police motorcycle within three feet of her and standing even closer as she emerged from her car. He first said he was talking to

---

[7] At oral argument, counsel for the People pointed out that defendant initially testified that Helfrich "asked" her to put out her cigarette and put down her soda can. However, defendant later answered affirmatively when asked if Helfrich "told" her to put out her cigarette and Helfrich, although he could not recall what he told defendant, said it was his practice to "tell" people to put out their cigarettes, providing substantial evidence for the court's "command" finding. Also, the trial court made its finding that Helfrich "commanded" defendant to put out her cigarette prior to smelling alcohol, although Helfrich did not recall whether or not he had done so. We do not disturb the trial court's determination of the credibility of Helfrich and defendant on this subject nor its resolution of any conflicts in the evidence. (*Woods*, *supra*, 21 Cal.4th at p. 673.)

Even if the trial court had found that Helfrich merely "asked" her to put out her cigarette and put down her soda can, it has been found under similar circumstances that an officer doing so does not negate the coercive nature of the request. (See *United States v. Beauchamp* (6th Cir. 2011) 659 F.3d 560, 569 [concluding that asking someone for identification or to exit his vehicle rather than telling the person was a "purely semantic" distinction].)

[8] Defendant also testified that Helfrich told her to stay where she was when she tried to walk away, whereas Helfrich testified to the contrary. As we have discussed, such a circumstance would go a long way towards establishing a detention occurred. (*People v. Aldridge*, *supra*, 35 Cal.3d at pp. 476–477; *Barber v. Superior Court*, *supra*, 30 Cal.App.3d at p. 330.) The trial court's statement of its decision made no reference to it, and it is unclear whether or how the trial court resolved this credibility-based factual question. Therefore, we have not considered this evidence in our analysis.

19

her because *her passenger* had flicked ashes out the car window and asked for her driver's license. Although Helfrich did not block defendant's path, sound any sirens or shine any lights, his physical closeness to her as she stood between him and her vehicle, and his pointed statement about the conduct of the passenger of a car defendant had just completed driving, followed by his immediate request for her identification, would have placed an objectively reasonable person on alert that Helfrich might be investigating her specifically for a possible violation of the law and, therefore, created doubt as to whether she was free to leave. Helfrich's statement to defendant implicated her responsibility as driver and could be understood as an accusation that she had violated the law (see *Lopez*, *supra*, 212 Cal.App.3d at p. 292 ["questions of a sufficiently accusatory nature may by themselves be cause to view an encounter as a nonconsensual detention"]). It is greater than any of the initial inquiries discussed in *Leath*, *Terrell*, *Lopez* and *Bouser*, none of which involved statements by an officer indicating suspicion that the defendant specifically engaged in illegal activity.

Moreover, Helfrich added to such suspicions of an objectively reasonable person by immediately following this statement with a request for *defendant's* driver's license, taking the license and holding it as he initiated a record check of *defendant*, all without further explanation. Defendant had just parked her Expedition. It is reasonable to presume that she would need her driver's license to drive, as well as for other purposes. This suggests Helfrich's decision to hold her driver's license had at least some coercive effect, as defendant's walking away without it would have limited her ability to function. (See *United States v. Chavez-Villarreal* (5th Cir. 1993) 3 F.3d 124, 128 [noting the coercive nature of a border agent's retention of Chavez-Villarreal's alien registration card, which "was vital to Chavez-Villarreal's legal presence in this country; without it, his disposition, if indeed ability, to decline [the agent's request to search his vehicle] expectedly was significantly impaired"]; see also *United States v. De La Rosa* (11th Cir. 1991) 922 F.2d 675, 683-684 (Clark, J., dissenting) [noting that "the most valuable piece of personal identification possessed by most citizens is their driver's license" and

20

that "those who have been unfortunate enough to lose their driver's licenses know how completely disabled one is from participating in many of the incidents of everyday life"].)

Also, around the time he asked defendant for her driver's license, Helfrich also directed defendant to put out her cigarette and to put down her soda can, directives that would heighten an objectively reasonable person's suspicion that she was under police investigation and not free to leave. (See *People v. Aldridge*, *supra*, 35 Cal.3d at pp. 476–477; *Barber v. Superior Court*, *supra*, 30 Cal.App.3d at p. 330.)

Finally, as indicated in the segment of the video recording from Helfrich's body camera, after these actions, Helfrich began questioning the passenger about his flicking ashes out the window and about his personal information while filling out a form, and then called that information in via his radio. This indicates two things. First, it appears from the testimony and this video that Helfrich did not focus on the passenger until *after he* stopped and spoke to defendant, and initiated a record check of her. This would suggest to an objectively reasonable person that she was a principal focus of the inquiry. Second, an objectively reasonable person who was the driver of the car would reasonably assume that Helfrich might be filling out a citation for a violation of the law by the passenger—and that he would also do so for her, given his conduct up to that point.

The appellate division appropriately noted that Helfrich did not raise his voice, and that on the video he and defendant were cordial, friendly and smiling. We agree with this assessment, but it does not overcome the effect of Helfrich's overall approach, which the trial court concluded would cause an objectively reasonable person to believe she was under investigation for a possible violation of the traffic laws as the driver of a vehicle in which a passenger flicked ashes out the vehicle's window. There was substantial evidence supporting that determination.

Moreover, we emphasize that the circumstances discussed in *Leath*, the case primarily relied upon by the appellate division, and the other cases cited by the People are different from those in the present case in one important respect. That is, the trial court here found that Helfrich commanded defendant to put out her cigarette, and defendant's undisputed testimony was that he also told her to put down her soda can, in the course of

21

his request for her identification, his taking and retention of it, and his initiation of a record check without further explanation.  Whether characterized as requests or commands, these directives represent a significant exercise of coercive authority.  No such directives were given by the officers in *Leath* or the other cases discussed by the People.

Further, the appellate division relied on *Leath* in part because *Leath* favorably quoted another court's conclusion that *Castaneda*'s holding "essentially 'eviscerate[s] the rule that a law enforcement officer may ask an individual for identification without having any suspicion that he or she has committed a crime, because as soon as the individual complies with the constitutional request, an unconstitutional seizure will have occurred.' " (*Leath*, *supra*, 217 Cal.App.4th at p. 353.)  The taking of defendant's driver's license would be less significant if Helfrich had merely taken defendant's driver's license, examined it, and promptly returned it to her.  As we have indicated, "asking for and examining . . . [one's] driver's license [is] no doubt permissible." (*Royer*, *supra*, 460 U.S. at p. 501.)

However, that is not all that occurred here.  After suggesting that defendant might have been responsible for a traffic violation, Helfrich took and then held on to defendant's driver's license as he conducted a record check of her that he did not explain.[9]  He then began to question her passenger and write down his answers in a manner that suggested further police investigation.  Indeed, a rule that the courts could not consider the fact that an officer took *and* held onto an identification card while conducting a record check would be the same kind of bright-line test as the one articulated in *Castaneda*, which we have rejected for similar reasons.  We consider *all* the facts; *Bostick*'s totality of the circumstances rule requires that we do so.  We cannot conclude that an objectively reasonable person in the present circumstances would feel

---

[9] These facts also distinguish the present case from *Lopez*, in which illegal drugs popped out of a wallet when it was first opened by an officer. (*Lopez*, *supra*, 212 Cal.App.3d at p. 291.)

22

free either to walk away without her driver's license or to interrupt Helfrich's investigation to ask for her driver's license to be returned so that she could leave.

We are not alone in our conclusions. We have in our own research found numerous well-reasoned cases in other jurisdictions that, like *Leath* and the others we have discussed, engage in a "totality of the circumstances" analysis or its equivalent, but nonetheless conclude that an officer's taking of a person's identification card and retention of it while running a record check or engaging in further questioning weighs in favor of a finding of an unlawful detention. (See *Horne v. State* (Fla.Dist.Ct.App. 2013) 113 So.3d 158, 161 ["the officer's asking to search Horne without returning her license outweighs the fact that she initially voluntarily spoke with the officer and consented to the warrants check"]; *Barna v. State* (Fla.Dist.Ct.App. 1994) 636 So.2d 571, 572 [police engaged in an unlawful investigatory stop when they told the defendant they were "investigating" because he was in a parking lot known for criminal activity and retained his identification card while running a computer check of him]); *Commonwealth v. Oscar Lyles* (Mass. 2009) 905 N.E.2d 1106, 1110 [when an officer not only reviewed a defendant's voluntarily given identification card but retained it "to run a check for outstanding warrants, notably without the defendant's consent . . . [the officer] was implicitly commanding the defendant to remain on the scene" and "a reasonable person would not believe that he could terminate the encounter and leave"]; *State v. Daniel* (Tenn. 2000) 12 S.W.3d 420, 427–428 [an unlawful seizure occurred when, after requesting and examining a defendant's identification card, the police officer retained it and conducted a warrants check]; see also *Royer*, *supra*, 446 U.S. at p. 501 ["when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized"]; *United States v. Jordan* (D.C. Cir. 1992) 958 F.2d 1085, 1088 ["what began as a consensual encounter . . . graduated into a seizure when the officer asked Jordan's consent to a search of his bag, after he had taken and still retained Jordan's driver's license"]); *United States v. Glover* (2d Cir. 1992) 957 F.2d

23

1004, 1009 [a seizure occurred when a government agent asked the defendant to go from a public area to a security office for further questioning without returning his identification card or indicating he was free to leave].)[10]

In short, an objectively reasonable person would not have felt free to end the encounter with Helfrich under the totality of the circumstances. We agree with the trial court's conclusion that an unlawful detention occurred.

## DISPOSITION

The appellate division's decision is reversed and the trial court's order granting defendant's motion is affirmed.

---

[10] These and similar cases are particularly noteworthy in light of recent empirical research suggesting that a significant number of people do not feel free to leave when approached by police, and even less so when police assert even mild forms of authority. (See Note, *Casual or Coercive? Retention of Identification in Police-Citizen Encounters* (2013) 113 Colum. L.Rev. 1283, 1312-1313 [noting studies such as one in which half the respondents indicated that they would feel either not free to leave or less than somewhat free to leave in a mere conversation with police on a sidewalk and concluding, "[t]hus, it appears that any interaction with a police officer, even at the lowest level of intrusiveness, makes most citizens feel that they are not free to leave"]; Smith et al., *Testing Judicial Assumptions of the "Consensual" Encounter: An Experimental Study* (2013) 14 Fl. Coastal L.Rev. 285, 319-320 [noting that while nearly three-quarters of the sample used in the study perceived the encounters with sworn, armed security as consensual, forty-five percent also believed they had no right to walk away or ignore the security officers' requests]; see also Ross, *Can Social Science Defeat a Legal Fiction? Challenging Unlawful Stops Under the Fourth Amendment* (2012) 18 Wash. & Lee J. Civil Rts. & Soc. Just. 315, 331-339 [discussing empirical studies].)

24

 

 

_____
STEWART, J.


We concur.



_____
KLINE, P.J.



_____
MILLER, J.

*People v. Linn* (A145052)

Trial Court:   Napa County Superior Court

Trial Judge:   Hon. Rodney G. Stone

Counsel:

Gary Lieberstein, District Attorney, Pooja Kumar and Bradley Morrow, Deputy District Attorneys, for Plaintiff and Appellant.

Ronald H. Abernethy, Public Defender, Ji-Hyun Cho, Deputy Public Defender, for Defendant and Respondent.