Filed 7/18/22  P. v. Gorrin CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROGER GORRIN, JR.,<br><br>    Defendant and Appellant. | A162982<br><br>(Lake County<br>Case Nos. CR956736, CR959066) |

Defendant Roger Gorrin, Jr. contends the trial court erred in denying his motion to suppress evidence he claims was seized following an unlawful detention.  We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Case No. CR956736

In March 2020, the Lake County District Attorney filed an information in case no. CR956736 (the "dirk case") charging Gorrin with felony carrying a concealed dirk or dagger (Pen. Code, § 21310).[1]  Gorrin moved to suppress evidence of the weapon.  Following a contested hearing, the trial court denied the suppression motion.  In June 2021, Gorrin pleaded no contest to carrying a concealed dirk or dagger.

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

**B. Case No. CR959066**

In December 2020, the Lake County District Attorney filed an information in case no. CR959066 (the "domestic violence case") charging Gorrin with inflicting corporal injury on a cohabitant with whom he was in a dating relationship (§ 273.5, subd. (a); count 1), assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), and battery causing serious bodily injury (§ 243, subd. (d); count 3). As to counts 1 and 2, the information alleged Gorrin personally inflicted great bodily injury (§ 12022.7, subds. (a), (e)). It also alleged that Gorrin committed the crimes while out on bail in the dirk case (§ 12022.1). In March 2021, a jury found Gorrin guilty on counts 1 and 3. The jury was unable to reach a verdict on count 2, and the court declared a mistrial as to that count.

**C. Sentencing and Appeal in Both Cases**

In June 2021, the trial court sentenced Gorrin to an aggregate term of six years in prison in both the dirk and domestic violence cases. This consisted of a four-year sentence in the domestic violence case (the principal term) and an additional two-year sentence for the on-bail enhancement. It also included a two-year sentence in the dirk case to run concurrent to his sentence in the domestic violence case. Gorrin asserts the concurrent sentence in the dirk case was part of his plea agreement, and that as part of his plea, he agreed to receive the four-year sentence in the domestic violence case plus the two years for the on-bail enhancement. Gorrin noticed appeals in both cases. His appeal in the dirk case is based on the denial of the motion to suppress. As Gorrin does not raise any contentions on appeal in the domestic violence case, we do not discuss the facts from that proceeding in any further detail.

2

## DISCUSSION

The sole issue on appeal is whether the trial court in the dirk case erred in denying Gorrin's motion to suppress evidence of the weapon, which he asserts was obtained as part of an unlawful detention.

### A.     Additional Facts

At the suppression hearing, Lake County Sheriff's Office Deputy Demetrius Donaldson testified that on February 14, 2020, around 10 a.m., he was patrolling the area of Highway 20 and the Nice-Lucerne cutoff when he observed a man, later identified as Gorrin, inside the central island of the traffic circle, or roundabout. The island was elevated about 8 inches off the road with no walkways or marked pedestrian crosswalks to access it. It was uncommon for pedestrians to be on the island, which large vehicles occasionally drove over to manage sharp turns onto the converging roads. Donaldson thought Gorrin was in harm's way and could possibly be struck by a vehicle.

Donaldson parked his patrol car on the island, or the "inner shoulder" of the roundabout. The car was parked in such a way that Gorrin would still be able to walk in three other directions. Donaldson activated his emergency lights to prevent being hit by another vehicle.

Donaldson approached Gorrin and asked for identification; Gorrin identified himself. Donaldson explained that he asks people for identification in order to know with whom he is speaking and run a records or warrant check to "make sure they're not wanted persons." While Donaldson was running a records check on Gorrin, Gorrin spontaneously stated he had a knife. Donaldson told Gorrin not to reach for his weapon and he would not reach for his either. While the records check was finishing, Gorrin placed his

3

hands behind his head and interlaced his fingers, gestures which Donaldson perceived as consent to search his person.

After Gorrin placed his hands behind his head, Donaldson approached him to remove the knife. He placed his hands on top of the back of Gorrin's hands and asked for consent to remove the knife. Gorrin gave verbal consent, and Donaldson reached into one of Gorrin's pockets and removed a fixed-blade knife concealed within his clothing. During their interaction, Donaldson noticed Gorrin had red, watery eyes, had difficulty standing, and smelled of alcohol. Donaldson placed Gorrin under arrest for possession of a concealed fix-blade knife and public intoxication. After a short struggle involving some resistance by Gorrin, Donaldson managed to handcuff him.

At the hearing, the court viewed videos of the encounter between Gorrin and Donaldson taken by Donaldson's body camera and the mobile audio video device on his patrol car. Gorrin introduced no further evidence.

The court denied Gorrin's suppression motion, explaining as follows: "An officer is entitled to talk to persons, it doesn't instantly become a detention. That's well established in the law. Here, he says he saw someone standing in the roundabout, traffic circle, which is an unusual place, he said, to see someone standing. And, well, it is. It's not a crosswalk, it's not a place where you see pedestrians. So that was his reason to go up to him and talk to him. [¶] But he doesn't even need a reason. You can talk – they can talk to people in public. . . . [¶] But here the officer sees the defendant doing something a little unusual, and he's in a little bit of danger. . . . But he approached him, he doesn't block his path. It's not like he's in a car and he pins him in, he's free to walk [in] any direction he wants. And he just asks, 'What you doing here?' [¶] You can ask him for ID, that doesn't make it a detention. Cases don't hold that asking for ID is detention. [¶] There's no

4

handcuffs. I mean, this is at the time that the defendant says, 'I've got a knife.' That's the issue. I note that that's a very casual conversation. The defendant volunteers it. There's no yelling, there's no demanding, the officer's not waving a gun, he's not making orders, there's no other officers around. I don't think a reasonable person would feel they're being detained, I think they would be free to leave. I don't see a detention."

## B.    Analysis

Gorrin contends the trial court erred in its ruling and that a detention occurred during his initial encounter with Donaldson, or at the very least when Donaldson took his identification and ran a warrant check. We disagree.

"When reviewing a ruling on a motion to suppress, we review the trial court's factfindings for substantial evidence. [Citation.] We accept factual inferences in favor of the trial court's ruling. [Citation.] Where testimony conflicts, we accept the trial court's resolution of disputed facts, its evaluations of credibility, and the version of events most favorable to the prosecution. [Citation.] We look only at the evidence in support of the successful party and draw all reasonable inferences in that side's favor. We disregard the contrary showing, as well as the weight of the evidence." (*People v. Chamagua* (2019) 33 Cal.App.5th 925, 928 (*Chamagua*).) We review the court's legal conclusions de novo and apply our independent judgment to measure the facts determined by the trial court against the constitutional standard of reasonableness. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

"The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are 'unreasonable.' [Citations.] Our state Constitution has a similar provision.

(Cal. Const., art. I, § 13.)" (*People v. Souza* (1994) 9 Cal.4th 224, 229.) "For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from the least to the most intrusive. First, there are . . . 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever — i.e., no 'seizure,' however minimal — and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.] Second, there are what are commonly termed 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' [Citation.] Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.)

A consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment. (*Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Florida*).) "It is well established that law enforcement officers may approach someone on the street or in another public place and converse if the person is willing to do so" without having any "articulable suspicion of criminal activity." (*People v. Rivera* (2007) 41 Cal.4th 304, 309.) An encounter is consensual if a reasonable and innocent person would feel free to leave or to refuse to cooperate with the police. (*Florida*, at pp. 434, 438].)

In contrast to a consensual encounter, a seizure occurs when a police officer intentionally restrains an individual's freedom of movement either physically or through a show of authority. (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.) The test for whether a police officer's conduct amounts to a

detention is whether the officer's conduct would indicate to a reasonable person that he or she is not free to leave or to otherwise terminate the encounter. (*Ibid.*)

In determining whether a reasonable person would have believed she or he was free to leave or end the encounter, a court must consider the totality of the circumstances from the perspective of a reasonable person in the defendant's position. (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*); *Ford v. Superior Court* (2001) 91 Cal.App.4th 112, 124.) In doing so, the court "assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*Manuel G.*, at p. 821.) "Uncommunicated views of the officer and subjective beliefs of the citizen are irrelevant." (*Chamagua, supra*, 33 Cal.App.5th at p. 929.)

In *People v. Terrell* (1999) 69 Cal.App.4th 1246 (*Terrell*), the officers observed Terrell on a park bench with two other men, one of whom appeared to be under the influence of a controlled substance. (*Id.* at p. 1251.) After engaging Terrell in a brief conversation, one of the officers asked him for identification. (*Ibid.*) Terrell provided identification, the officer conducted a records check, and Terrell was arrested after the check revealed an outstanding warrant. (*Ibid.*) The court ruled no detention took place during Terrell's initial encounter with officers, reasoning that under the totality of the circumstances the entire encounter was consensual including Terrell's "spontaneous and voluntary action" in handing over his identification. (*Id.* at

7

p. 1254.) The court added that the entire encounter lasted about three minutes, and there was no indication from the officers Terrell was not free to leave. (*Ibid*.) There was no illegal detention, "i.e., the temporary seizure of appellant without a reasonable suspicion that criminal activity was afoot and appellant was involved." (*Ibid*.)

In *People v. Leath* (2013) 217 Cal.App.4th 344 *(Leath)*, two police officers investigating a robbery spotted a vehicle near the scene of the crime matching a description of the robbers' vehicle. (*Id*. at p. 348.) One of the officers asked Leath his name and if he had any identification. (*Ibid*.) Leath handed officers his identification, and they checked for outstanding warrants. (*Ibid*.) Adopting the rule that "a voluntary relinquishment of one's identification card does not constitute a seizure as long as the encounter is consensual under the totality of the circumstances," the court concluded there was no detention. (*Id*. at p. 353.) Leath had voluntarily complied with the officers' request — not demand — for identification. (*Ibid*.) In addition, the officers never accused Leath of illegal activity when they first addressed him, nor did they ever use or threaten physical force against him. (*Ibid*.) There was also no evidence that had defendant asked the officers to return his identification, they would not have complied. (*Ibid*.)

As in *Terrell* and *Leath*, there was no illegal detention here. The record supports the court's conclusion that a reasonable person in Gorrin's situation would have felt free to leave at any point during his interaction with Donaldson up to and including the warrant check. Based on the People's uncontradicted evidence, Gorrin was a pedestrian in the center of a roundabout on a public road. Donaldson, who arrived alone in his patrol car, was the only officer who engaged with him. Gorrin was not pinned in by Donaldson's car and could walk away in multiple directions. The court

8

further found that when Donaldson asked Gorrin for his identification, it was part of a casual conversation. Donaldson did not accuse Gorrin of any illegal conduct and there was no evidence Donaldson yelled, spoke aggressively, or used coercive commands. There was also no evidence Donaldson used or displayed a weapon or handcuffs or placed his hands on Gorrin when asking for identification or running the warrant search. Under the totality of circumstances, there was no intentional restraint of Gorrin's freedom of movement either physically or through a show of authority. Accordingly, the trial court did not err in concluding there was no unlawful detention.

Gorrin contends he had not violated any criminal or traffic laws by being in the roundabout and thus Donaldson did not have an articulable suspicion of criminal activity or a basis for detaining him. This argument is unavailing. The trial court found, and the record supports its finding, that there was no detention up to the point of the warrant check. Therefore, Donaldson's encounter with Gorrin to that point did not need to be justified with articulable suspicion of a traffic violation or other form of criminal activity. *People v. McNeil* (2002) 96 Cal.App.4th 1302, and *People v. Ramirez* (2006) 140 Cal.App.4th 849 – cases in which detentions were found unjustified because the defendants had not violated the traffic laws proffered as the reason for their detentions – do not apply.

We also readily reject Gorrin's contention that a detention occurred during his initial encounter with Donaldson, that is, when Donaldson "parked his vehicle on the shoulder of the road in front of or near [Gorrin], turned on his emergency lights, contacted [Gorrin], and asked him what he was doing." "The United States Supreme Court has made it clear that a detention does not occur when a police officer merely approaches an individual on the street and asks a few questions. . . . Only when the officer,

9

by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur." (*Manuel G.*, *supra*, 16 Cal.4th at p. 821.) Donaldson needed no justification to approach Gorrin and ask him what he was doing. Moreover, there was no physical force or show of authority during this initial counter. As the trial court observed, Gorrin was free to walk away notwithstanding how or where Donaldson parked his patrol car, and the question he posed to Gorrin regarding what he was doing in the roundabout was asked casually. The emergency lights, which Gorrin repeatedly emphasizes, did not escalate a standard consensual encounter to a detention. We consider " 'the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation.' " (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1106.) Under the totality of the circumstances, Gorrin was not detained by Donaldson in their initial encounter.

Further, we are not persuaded by Gorrin's argument that, if not earlier, his interaction with Donaldson became an unlawful detention when Donaldson asked him for identification and ran a warrant check. As noted above, a request for identification without more is not a detention. (See *Terrell*, *supra*, 69 Cal.App.4th at p. 1254; *Leath*, *supra*, 217 Cal.App.4th at p. 353; *People v. Vibanco* (2007) 151 Cal.App.4th 1, 13 [" 'In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.' "]; *People v. Linn* (2015) 241 Cal.App.4th 46, 63 (*Linn*) ["[A]n officer's taking of a voluntarily offered identification card, while it may be considered as a factor in evaluating whether a detention has occurred pursuant to a review of all the circumstances involved in an encounter, is not alone definitive in resolving that question."].) Accepting the

identification to run a warrant check did not automatically transform it into a detention either. (See *Leath*, *supra*, 217 Cal.App.4th at p. 353.)

The cases Gorrin relies on to argue a detention based on Donaldson asking for his identification are unavailing. In *People v. Castaneda* (1995) 35 Cal.App.4th 1222 (*Castaneda*), a police officer approached Castaneda as he was seated in the passenger seat of an illegally parked car. (*Id.* at p. 1225.) The officer requested identification and asked Castaneda who owned the car. (*Id.* at pp. 1225–1226.) Castaneda handed the officer his identification card and told him the car was owned by a friend who lived in a nearby apartment. (*Id.* at p. 1226.) The officer radioed for information on the car's registration and Castaneda's warrant status while another officer filled out a parking citation for the car. *(Ibid.)* On appeal, the court acknowledged that an officer's request for identification was permissible but determined that "once Castaneda complied with [the] request and submitted his identification card to the officers, a reasonable person would not have felt free to leave." (*Id.* at p. 1227.)

*Castaneda* does not establish that Gorrin was detained. The case does not establish a per se rule that a person's voluntary submission of his identification to an officer transforms a consensual encounter into a detention. *Castaneda* only instructs us that an officer's retention of a defendant's identification card may be a relevant factor in determining whether an encounter is consensual, but it cannot be the sole, dispositive factor. (See *Linn*, *supra*, 241 Cal.App.4th at p. 63.) As the court in *Leath* properly observed, a strict reading of *Castaneda* " 'eviscerate[s] the rule that a law enforcement officer may ask an individual for identification without having any suspicion that he or she has committed a crime, because as soon as the individual complies with the constitutional request, an

11

unconstitutional seizure will have occurred.' " (*Leath*, *supra*, 217 Cal.App.4th at p. 353.) Moreover, the fact that one of the officers in *Castaneda* was filling out a parking citation for the defendant's illegally parked car sufficiently distinguishes the circumstances that converted that encounter to a detention. (*Castaneda*, *supra*, 35 Cal.App.4th at p. 1226.)

In *Linn*, *supra*, 241 Cal.App.4th 46, another case Gorrin relies upon, the police officer observed the passenger in Linn's car flicking cigarette ashes out the window, a Vehicle Code violation. (*Id.* at p. 51.) The officer stopped his marked police motorcycle next to the car, which had since parked, as Linn and her passenger were getting out of the car. (*Ibid.*) The officer did not turn on lights or sirens, block Linn's path, or display a weapon. (*Ibid.*) After the officer asked the passenger about the ashes, he turned his attention to Linn and asked to see her identification. (*Ibid.*) Linn handed over her license, which the officer took and used to run a warrant search. (*Id.* at p. 52.) Linn testified that she tried to walk away when she got out of her car but the officer asked her to " 'stand there, stay there.' " (*Ibid.*) The officer also asked her to put out the cigarette she was smoking and put down the soda she was drinking. (*Ibid.*) On appeal, the court concluded that an objectively reasonable person in this situation would not feel free to leave. (*Id.* at pp. 64–67.) The court agreed that the officer's "overall approach . . . would cause an objectively reasonable person to believe she was under investigation for a possible violation of the traffic laws as the driver of a vehicle in which a passenger flicked ashes out of the vehicle's window." (*Id.* at p. 66.) It could not conclude "that an objectively reasonable person in the present circumstances would feel free either to walk away without her driver's license or to interrupt [the officer]'s investigation to ask for her driver's license to be returned so that she could leave." (*Id.* at p. 67.) The court went on to hold

12

that "an officer's taking of a person's identification card and retention of it while running a record check or engaging in further questioning weighs in favor of a finding of an unlawful detention." (*Id*. at pp. 67–68.)

*Linn*, too, does not establish that Gorrin was detained once Donaldson received his identification and ran a warrant search. *Linn* expressly states the act of taking a voluntarily tendered identification is "not alone definitive" in determining whether a detention has occurred. (*Linn, supra*, 241 Cal.App.4th at p. 63.) The circumstances of *Linn* are also sufficiently different from the one before us. Here, Donaldson never thwarted any attempt by Gorrin to leave the roundabout. Nor did Donaldson ever command Gorrin to stay where he was or issue supplemental commands to him like the ones given to Linn that would have suggested Linn was not free to leave and in the court's view "represent[ed] a significant exercise of coercive authority." (*Id*. at p. 67.)

Finally, Gorrin contends that his voluntary statement that he had a knife and his consent for Donaldson to remove the knife were invalid because they were "submissions to authority, inextricably bound up with the illegal detention." Since we have determined there was no illegal detention prior to his disclosure of the weapon and granting of consent, we need not address this argument. Likewise, we do not address Gorrin's argument that his alleged resistance to arrest and intoxication did not justify his detention because there was no legal basis for stopping him in the first place. As we have explained, Donaldson needed no justification to approach Gorrin and ask him what he was doing. Gorrin was not illegally detained during his initial encounter with Donaldson, so these later events have no bearing on our analysis as to the lawfulness of the earlier encounter.

**DISPOSITION**

The judgments in case nos. CR956736 and CR959066 are affirmed.

_____

Petrou, J.


WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Rodríguez, J.


*A162982/People v. Gorrin Jr.*

15