Filed 1/15/21  P. v. Andrews CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087084 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE013634) |
| v. | |
| WILLIAM ANDREWS, | |
| Defendant and Appellant. | |

Defendant William Andrews was convicted by jury of felony possession of methamphetamine and misdemeanor possession of a smoking device for a controlled substance, i.e., a glass pipe.[1]  The pipe was found during a search incident to defendant's arrest for an outstanding warrant, after the arresting officer, Joseph Viergutz, asked defendant whether he had anything illegal on him and defendant admitted:  "I have a

---

[1]    Defendant was also charged with possession of a dirk or dagger.  The jury acquitted defendant of that count.

meth pipe." The methamphetamine was found in defendant's sock just before Viergutz brought him into the jail. In a bifurcated proceeding, the jury also found defendant had previously been convicted of two strike offenses within the meaning of the three strikes law. After striking one of these prior strikes for purposes of sentencing (see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497), the trial court sentenced defendant to serve six years in state prison.[2]

On appeal, defendant contends: (1) the trial court violated his Fourth Amendment right against unreasonable search and seizure by admitting evidence obtained following an unlawful detention; (2) the trial court also violated defendant's Fifth Amendment right against compulsory self-incrimination by admitting certain statements obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694]; (3) the trial court further violated defendant's due process right to a fair trial by allowing a deputy district attorney to testify as an expert in interpreting records of conviction in violation of the advocate-witness rule; (4) the trial court also violated defendant's constitutional right to due process by imposing a mandatory restitution fine and other mandatory assessments without determining his ability to pay; and (5) the abstract of judgment must be corrected to conform to the oral pronouncement of judgment.

We affirm. As we shall explain, contrary to defendant's position on appeal, he was not detained by Officer Viergutz until after the officer discovered the outstanding warrant for his arrest, at which point defendant was arrested and lawfully searched incident to that arrest. Any *Miranda* violation was manifestly harmless because the pipe was discovered during a lawful search incident to arrest, and would have been discovered regardless of whether or not defendant admitted he had it, and the methamphetamine in

---

[2]    This sentence was imposed after the trial court, pursuant to Penal Code section 1170, subdivision (d), recalled defendant's original sentence of 25 years to life, initially imposed after the trial court denied defendant's *Romero* motion.

defendant's sock would inevitably have been discovered during a booking search, at which point defendant would have been subject to an additional felony charge for bringing narcotics into the jail. We also reject both of defendant's due process claims for reasons set forth in the discussion portion of the opinion. However, as the Attorney General concedes, because the abstract of judgment does not conform to the oral pronouncement of judgment, we shall direct the trial court to correct the abstract of judgment.

BACKGROUND

Because the entirety of the interaction between defendant and Officer Viergutz was captured on the officer's body camera, we recite the background facts based on our review of that video, supplemented by the officer's testimony during the hearing on defendant's suppression motion.

On July 23, 2017, about 11:00 a.m., Officer Viergutz was dispatched to 23rd and V Streets in Sacramento in response to an anonymous report of a Black man "wearing a black sweater and gray pants," who was reportedly "smoking crack" while "sitting in a green area" in that location. When Viergutz arrived at that intersection, he parked his patrol car and approached defendant on foot wearing his police uniform. Defendant was wearing a black shirt with black pants and was a short distance down V Street, sitting in a berm of greenery between the street and sidewalk with a plastic bag.

As Officer Viergutz approached defendant, he introduced himself and asked: "What are you up to, my man?" Defendant stood up with his hands in his pockets, prompting Viergutz to ask him to take his hands out of his pockets while they talked. Defendant did so and said something not entirely coherent about the government and an "environmental issue." Viergutz asked defendant where he lived. When defendant answered, the officer responded: "So you don't belong to this neighborhood." Defendant replied, "I do," and explained that he was doing an investigation into certain government activity. Viergutz asked for defendant's name. Defendant provided it.

3

Viergutz then asked whether defendant was on probation or parole or had "been in trouble." Defendant answered, "yeah, I've been in trouble," and said he was accused of something he did not do. At this point, Viergutz informed defendant that someone had complained about narcotics activity. Defendant again explained that he was doing an investigation, adding "all my reports, they go in, they go in, like they should." Viergutz asked for defendant's date of birth, defendant provided it, and Viergutz asked: "Do you mind grabbing your bag and coming over to my car?" Defendant did so. As they walked over to the car, Viergutz said to defendant: "I'm just going to figure out who you are and then we'll finish this, okay?" He then told defendant: "Just have a seat on my front bumper for me, okay?" Defendant did so.

This portion of the interaction between defendant and Officer Viergutz lasted about two and a half minutes. Viergutz never blocked defendant's path of travel and maintained a distance of 8 to 10 feet. Although it was apparent the officer was suspicious of defendant's purported reason for being there, his tone of voice remained friendly throughout.

As defendant sat on Officer Viergutz's front bumper with his bag of belongings, Officer Viergutz got into the vehicle and ran defendant's name through the California Law Enforcement Telecommunications System (CLETS), discovering an outstanding warrant for defendant's arrest due to parole suspension. With this information, Viergutz got out of the vehicle and placed defendant under arrest. After cuffing defendant, Viergutz asked "anything on you sharp?" Defendant answered that he had a knife. Viergutz retrieved the knife from defendant's pocket and asked: "Why would you not tell me about this?" Defendant responded that he had the knife because of the dangers involved in the "operation" he was on. Viergutz asked defendant if he had "anything else illegal" in his possession. Defendant answered: "I have a meth pipe." Viergutz retrieved the pipe from defendant's pocket and asked: "Where is your meth at?" Defendant answered: "I don't have it." Viergutz then placed defendant in the back of the patrol car

4

and informed him that he was going to jail for a parole violation, possession of a dirk or dagger, and possession of narcotics paraphernalia.

When Officer Viergutz and defendant arrived at the jail, before walking into the building, the officer asked defendant: "Do you have any dope anywhere?" Defendant responded: "I got some in my sock." Viergutz informed defendant that if he entered the jail with drugs "it's two additional felonies." Viergutz then retrieved a small bag of methamphetamine from defendant's sock before bringing him inside the jail for processing.

Based on the foregoing facts, defendant moved to suppress the methamphetamine, pipe, and knife pursuant to Penal Code[3] section 1538.5, arguing Officer Viergutz unlawfully detained him based on an unreliable anonymous tip. Defendant also moved to suppress the statements he made to Viergutz following his arrest, arguing these statements were tainted by the unlawful detention. In response, the prosecution argued that regardless of the level of the reliability of the anonymous tip, Viergutz's interaction with defendant, from the moment of contact until the officer discovered defendant had an outstanding warrant, did not rise to the level of a detention, but was rather a consensual encounter. The trial court agreed with the prosecution's position and denied the motion to suppress.

Defendant filed a separate motion to suppress the statements he made to Officer Viergutz under *Miranda*, arguing he was in custody and interrogated by the officer without being advised of his *Miranda* rights. In response, the prosecution argued Viergutz's question regarding whether defendant had anything sharp on him, eliciting defendant's admission to being in possession of the knife, "clearly" fell within the public safety exception to the *Miranda* advisement requirement. Defendant's trial counsel

---

**3**      Undesignated statutory references are to the Penal Code.

5

conceded this point. With respect to the officer asking defendant whether he had "anything else illegal" on him, eliciting defendant's admission to being in possession of the "meth pipe," the prosecution argued the officer was still referring to anything dangerous, but acknowledged the wording was "kind of vague" and added: "I'll leave that up to the Court." Finally, the prosecutor argued the question the officer posed before entering the jail, eliciting defendant's admission to having methamphetamine in his sock, was also within the public safety exception to the *Miranda* advisement requirement.

The trial court ruled the first question was "clear officer safety." The second question was "sort of in between," but because it was asked immediately after asking whether defendant had anything sharp on him, the trial court concluded it was "a continuum of the same line of questioning" and also fell within the officer safety exception. With respect to the third question, the trial court concluded it was not asked for officer safety purposes, but rather as a "courtesy" to defendant. However, noting various statutes designed to keep narcotics and dangerous items out of the prisons and jails, the trial court ultimately concluded the question fell within the public safety exception.

With the foregoing items of evidence and defendant's statements in evidence, the case against defendant was very strong. As mentioned, he was convicted by jury of felony possession of methamphetamine and misdemeanor possession of a smoking device for a controlled substance; the jury acquitted him of possession of a dirk or dagger. In a bifurcated proceeding, the jury also found defendant had previously been convicted of two strike offenses within the meaning of the three strikes law. We provide some additional background regarding the bifurcated proceeding in the discussion that follows.

DISCUSSION

# I

### *Denial of Defendant's Section 1538.5 Motion*

Defendant contends the trial court violated his Fourth Amendment right against unreasonable search and seizure by denying his suppression motion under section 1538.5. We disagree.

"[W]e apply federal constitutional standards in deciding motions to suppress based on claims of illegal search and seizure." (*People v. Linn* (2015) 241 Cal.App.4th 46, 57 (*Linn*); Cal. Const., art. I, § 28.)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.] . . . Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

Distinguishing consensual encounters from detentions, our colleagues at the First Appellate District explained: " 'An officer may approach a person in a public place and ask if the person is willing to answer questions. If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution.' [Citations.] A detention, on the other hand, is a seizure, albeit a limited one, for which reasonable suspicion is required. [Citation.]" (*Linn*, *supra*, 241 Cal.App.4th at p. 57.) "A detention occurs when an officer intentionally applies physical restraint or initiates a show of authority to which an objectively reasonable person innocent of wrongdoing would feel compelled to submit, and to which such a person in fact submits. [Citations.] 'In situations involving a show of authority, a person is seized "if 'in view of all of the

7

circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' " or " 'otherwise terminate the encounter' " [citation], and if the person actually submits to the show of authority [citation].' [Citation.] The test for the existence of a show of authority is an objective one and thus, '[n]either the officer's uncommunicated state of mind nor the subjective belief of the individual citizen is relevant to the determination of whether a police contact is a detention . . . .' [Citation.]" (*Id.* at pp. 57-58.)

" 'Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' [Citations.] Our case law indicates that other relevant factors include the time and place of the encounter, whether the police indicated the defendant was suspected of a crime, whether the police retained the defendant's documents, and whether the police exhibited other threatening behavior. [Citations.] [¶] Questions by an officer of a sufficiently accusatory nature may 'be cause to view an encounter as a nonconsensual detention.' [Citation.] The same is true for commands or directions issued in the course of an encounter. [Citations.]" (*Linn*, *supra*, 241 Cal.App.4th at p. 58.)

Applying these principles to the encounter at issue in *Linn*, the appellate court concluded a detention occurred where the defendant, who was driving with a passenger in her car, was confronted by a motorcycle officer immediately after she parked and got out of the car. The officer parked his marked police motorcycle a few feet from the defendant's car and immediately informed her that her passenger was flicking ashes out of the window as they drove. He then asked for her driver's license, told her to put out her cigarette, and also told her to put her soda can on the ground. After a brief interaction between the officer and the passenger concerning the ashes, the officer detected the odor

8

of alcohol coming from the defendant and ultimately placed her under arrest for driving under the influence. (*Linn*, *supra*, 241 Cal.App.4th at pp. 51-53.)

Viewing the totality of the circumstances, the court concluded the defendant was unlawfully detained before the officer smelled the alcohol. (*Linn*, *supra*, 241 Cal.App.4th at pp. 63-64.) As the court explained, after "parking his marked police motorcycle within three feet of [the defendant] and standing even closer as she emerged from her car," the officer's "first statement to [her], intended to explain why he was talking to her, implicated her in the illegal activity of her passenger." (*Id*. at pp. 64-65.) He then asked for her driver's license, took it to run a records check, and also " 'commanded' defendant, as the trial court characterized it, to put out her cigarette and put down her soda can, thereby indicating that she was not free to do as she pleased." (*Id*. at p. 64, fn. omitted.) Acknowledging the officer did not block the defendant's path, activate his lights or sirens, or display his weapon, and further that the interaction between the officer and the defendant was "cordial" and "friendly," the court nevertheless concluded the entirety of the interaction would have caused "an objectively reasonable person to believe she was under investigation for a possible violation of the traffic laws as the driver of a vehicle in which a passenger flicked ashes out the vehicle's window" and therefore not free to terminate the encounter and drive away. (*Id*. at pp. 65-66; see also *People v. Aldridge* (1984) 35 Cal.3d 473, 476-477 [detention where the defendant was ordered to put his bag on the ground and stand next to the patrol car].)

Relying primarily on *Linn*, defendant argues Officer Viergutz's conduct "transform[ed] a consensual encounter into a nonconsensual detention," specifically Viergutz gave defendant "two commands to remove his hands from his pockets" and also "directed [defendant] to sit on the bumper of the patrol car and wait." We are not persuaded.

First, we take issue with defendant's characterization of these particular aspects of the encounter. Our review of the body camera footage reveals Officer Viergutz asked

9

defendant to take his hands out of his pockets while they talked. He asked him to do so twice, in quick succession, while defendant still had his hands in his pockets. Asking defendant to take his hands out of his pockets, by itself, "does not convert the encounter into a detention" unless "the manner in which the request was made constituted a show of authority such that [defendant] reasonably might believe he had to comply." (*People v. Franklin* (1987) 192 Cal.App.3d 935, 941.) Here, compliance with Viergutz's request was required in the sense that defendant had to do so *if* he consented to talk to the officer. However, nothing about the request itself would indicate to a reasonable person that he or she was not free to terminate the encounter and walk away. That is the important part for purposes of the detention analysis.

Defendant's assertion that Viergutz "directed" him to sit on the bumper of the patrol car is also belied by the body camera footage. The officer asked defendant: "Do you mind grabbing your bag and coming over to my car?" As defendant did so, Viergutz added: "I'm just going to figure out who you are and then we'll finish this, okay?" He then told defendant: "Just have a seat on my front bumper for me, okay?" Viergutz's tone was cordial and friendly while asking these questions. He began the first one with "do you mind" and concluded the last two with "okay?" These requests are far from the request for identification after impliedly accusing the defendant of criminal wrongdoing, followed by commands to put out the cigarette and put down the soda, at issue in *Linn*.

Second, we do not view these aspects of the encounter in isolation. Instead, we consider the totality of the circumstances surrounding the interaction between defendant and Officer Viergutz. As in *Linn*, Viergutz did not block defendant's path, activate his lights or sirens, or display his weapon during the encounter. As mentioned, the officer's tone was cordial and friendly throughout. These circumstances weigh in favor of finding the encounter to have been consensual. And unlike *Linn*, Viergutz did not stand within a few feet of defendant and immediately, albeit impliedly, accuse him of wrongdoing. Instead, the officer maintained a distance of 8 to 10 feet and engaged defendant in

10

conversation. To be sure, the conversation focused on defendant's identity, place of residence, and the reason he was at that particular location. Viergutz also asked whether defendant was on probation or parole. Then, after explaining the reason he was there, the officer asked whether defendant would consent to coming over to his car while he ran a records check. At no point during the encounter did Viergutz issue any commands at all, or make any sufficiently accusatory requests, such that a reasonable person in defendant's position would have believed he was not free to leave. (See also *People v. Lopez* (1989) 212 Cal.App.3d 289, 292-293 [officer's request for identification was not "sufficiently accusatory" to transform a consensual encounter into a detention where two officers stood on either side of the defendant and "launched into a short, albeit somewhat accusatory, interrogation" that was "brief, flip, and, most importantly, did not concern criminal activity"].)

Viewing the totality of the circumstances, we conclude the encounter between Officer Viergutz and defendant was consensual until the officer arrested defendant, at which point he had probable cause to do so.

## II

### *Denial of Defendant's* **Miranda** *Motion*

Defendant also claims the trial court violated his Fifth Amendment right against compulsory self-incrimination by admitting statements obtained in violation of *Miranda*. Any *Miranda* violation was harmless.

"The Fifth Amendment guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' " (*New York v. Quarles* (1984) 467 U.S. 649, 654 [81 L.Ed.2d 550].) In order to safeguard this right, the United States Supreme Court held in *Miranda* that statements made by a suspect during custodial interrogation are inadmissible unless the well-known "*Miranda* warnings" are provided and the suspect "freely decides to forgo those rights." (*New York v. Quarles,* at pp. 651, 654.)

11

The Attorney General concedes defendant was in custody when he made the statements at issue in this appeal, and further concedes Officer Viergutz's questions eliciting these statements amounted to interrogation. Nevertheless, the Attorney General argues, "the public safety exception excused Officer Viergutz's failure to admonish [defendant] under *Miranda* . . . because his questions were reasonably prompted by concern to protect himself or the public."

The " 'public safety' exception" to the *Miranda* advisement requirement was recognized in *New York v. Quarles*, *supra*, 467 U.S. 649, 655. There, a woman told police officers she had been raped and her attacker had just entered a nearby supermarket carrying a gun. One of the officers entered the market, spotted a man fitting the description provided by the woman, and detained him following a brief foot pursuit. Discovering the man was wearing an empty shoulder holster, the officer asked him where the gun was. The man answered, " 'the gun is over there,' " nodding towards some empty cartons, where the gun was found. (*Id.* at pp. 651-652.) Holding this question fell within the public safety exception, the high court explained: "We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." (*Id.* at pp. 657-658, fn. omitted.)

In *People v. Cressy* (1996) 47 Cal.App.4th 981 (*Cressy*), our colleagues at the First Appellate District applied this exception to a situation in which an officer, after arresting the defendant for possession of a syringe but before searching the defendant

12

incident to arrest, asked whether he had any other needles or paraphernalia on him. (*Id.* at p. 985.) The court explained: "[The officer] would have been derelict in his duties had he failed to search defendant before putting him in his patrol car and transporting him to jail. Officers are sometimes required to do dangerous things. They should not, however, be required to do the foolhardy. Sticking a hand in a pocket or squeezing clothing from the outside exposes officers to potentially life-threatening injury if the result is a puncture from a contaminated needle, razor, or other sharp object. Officers should be allowed to make narrow inquiry to avoid such danger. . . . The search is going to be conducted. If there is seizable material present, it will, in all likelihood, be discovered. Allowing a simple and narrow inquiry merely ensures that an officer need not put his safety at risk while engaging in otherwise lawful conduct." (*Id.* at pp. 988-989.)

However, the *Cressy* court was careful to add: "Our holding should be narrowly applied. It presupposes there is legal justification for a search. If justification is lacking, well-articulated Fourth Amendment principles apply and a person's reply to questioning may not be relied upon to justify an otherwise improper intrusion. In addition, inquiry must be narrowly tailored to prevent potential harm. Questions about needles or other potentially contaminated sharp objects would be permissible. General questions like 'What's in your pockets?' are overly broad. Allowable questions may only address the presence of items that might be harmful if they were seized without anticipation and particular caution. Questions about drugs in general, most firearms or similar kinds of seizable, but not immediately dangerous, items would fall outside this narrow exception. Finally, improper interrogation may not be engaged in under the guise of ensuring safety. If a suspect acknowledges the presence of a syringe, an officer is not free to inquire about how or when it was acquired or for what purposes without a *Miranda* admonition and waiver." (*Cressy*, *supra*, 47 Cal.App.4th at p. 989.)

Relying on the foregoing limitations the *Cressy* court placed on its holding, defendant argues Officer Viergutz's questions regarding (1) whether defendant had

13

anything sharp in his possession, (2) whether he had anything else illegal on him, and (3) whether he had any drugs on him before he entered the jail, exceeded the narrow confines of the public safety exception. We disagree with respect to the first question. Asking defendant whether he had anything sharp in his possession is precisely the sort of question that was held to be permissible in *Cressy*, as defendant's trial counsel conceded before the trial court. Nor are we persuaded the *Cressy* holding should be further limited to situations in which the arrestee is suspected of "needle use" or there is "other basis of concern for contamination." As in *Cressy*, Officer Viergutz "would have been derelict in his duties had he failed to search defendant before putting him in his patrol car and transporting him to jail. . . . Sticking a hand in a pocket or squeezing clothing from the outside exposes officers to potentially life-threatening injury if the result is a puncture from a contaminated needle, razor, *or other sharp object*. Officers should be allowed to make narrow inquiry to avoid such danger." (*Cressy*, *supra*, 47 Cal.App.4th at p. 988, italics added.)

Assuming, without deciding, that a *Miranda* violation occurred with respect to the latter two questions, the assumed violations are manifestly harmless under the *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] standard for assessing prejudice from federal constitutional errors because the glass pipe would have been discovered during the search incident to arrest regardless of whether or not defendant admitted he had it, and the methamphetamine would have been discovered during a booking search at the jail, at which point defendant would have qualified for an additional felony charge under section 4573. (See *People v. Low* (2010) 49 Cal.4th 372, 376.) "Inevitable discovery of evidence is a legitimate basis for denial of a suppression motion, even one focusing on the involuntariness of an admission or one obtained in violation of *Miranda*." (*In re Angel R.* (2008) 163 Cal.App.4th 905, 909-910, fn. omitted.) With the pipe and methamphetamine properly in evidence, we conclude beyond a reasonable doubt the jury

14

would have convicted defendant even if his statements had been excluded as elicited in violation of *Miranda*.

## III

### *Advocate-witness Claim*

Defendant further asserts the trial court violated his due process right to a fair trial by allowing a deputy district attorney to testify as an expert in reading and interpreting records of conviction in violation of the advocate-witness rule. He is mistaken.

### A.

### *Additional Background*

During the bifurcated trial of the prior strike allegations, the prosecutor called another deputy district attorney, Keith Hill, as an expert in reading and interpreting records of conviction. Defendant did not object to the trial court designating Hill an expert in this regard. Nor did defendant object to any aspect of his testimony.

During the prosecutor's direct examination, Hill identified a certified copy of defendant's records of conviction, including an abstract of judgment and minute order of conviction, and explained the records indicated defendant was previously convicted of one count of forcible oral copulation in concert and one count of forcible rape in concert, resulting in an aggregate sentence of 18 years in state prison. On cross-examination, defendant's trial counsel questioned Hill regarding the accuracy of the documents. On redirect, the prosecutor asked Hill whether he manipulated the documents. Hill answered: "No." The prosecutor then asked: "Did you make them up?" Hill answered: "I did not." Finally, the prosecutor asked: "Do we typically bring in forged documents to wrongly convict people?" Hill answered: "No."

### B.

### *Analysis*

"It is generally prohibited for a prosecutor to act as both an advocate and a witness. [Citation.] 'Within the criminal justice system, the prohibition against a

15

prosecutor's acting as both advocate and witness addresses "the concern that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors." ' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1185-1186.)

As a preliminary matter, we note defendant has forfeited any claim the prosecutor engaged in misconduct by violating the advocate-witness rule because he failed to object on this, or any, ground below. (*People v. Ballard* (1980) 104 Cal.App.3d 757, 762.) Moreover, although defendant relies on *People v. Donaldson* (2001) 93 Cal.App.4th 916, a case in which the appellate court held defense counsel provided constitutionally deficient assistance by failing to object to a prejudicial violation of the advocate-witness rule, defendant here does not specifically argue ineffective assistance of counsel in his briefing on appeal and has therefore forfeited such an argument. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 [declining to address issue not properly raised in opening brief].)

In an attempt to get around forfeiture, defendant argues the trial court possessed a sua sponte duty to prevent the prosecutor from calling another prosecutor from her office to testify as an expert in reading and interpreting records of conviction, and by failing to do so, impugned the integrity of the judicial process and violated defendant's due process right to a fair trial. In support of this argument, defendant relies on authority holding the trial court possesses broad discretion to recuse an attorney on its own motion where that attorney has an irreconcilable conflict of interest. (*People v. Peoples* (1997) 51 Cal.App.4th 1592, 1594, 1599 [trial court did not err in "recusing an attorney on its own motion where she appeared on behalf of her brother, accused of assault with a deadly weapon, against her former husband and father of her children, who were themselves percipient witnesses to the altercation"; such "representation posed a significant threat not only to her responsibilities to her children (both as a lawyer and mother), her brother/client, her ex-husband/victim, but, perhaps, most of all to the integrity of the

16

judicial process"].) Defendant also relies on a family law decision from this court holding the trial court did not abuse its discretion in recusing an attorney, not on its own motion, for a number of reasons, including the concern that the attorney would "almost inevitabl[y] . . . act both as a percipient witness and an advocate" in the custody dispute. (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1208.)

Neither of these cases hold a trial court possesses a sua sponte duty to prevent a violation of the advocate-witness rule notwithstanding defense counsel's failure to object to the purported violation. "Cases are not authority for propositions not considered therein." (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 614.) We decline to impose such a duty in this case.

In sum, to the extent defendant may raise the advocate-witness rule in this appeal, having failed to object below, he must do so under the rubric of ineffective assistance of counsel. However, as we have already explained, he has forfeited that argument as well. Finally, we note defendant would not prevail on such a claim in any event because ineffective assistance of counsel requires a showing of prejudice as an element of the claim and here, as defendant acknowledges in his briefing on appeal, "[t]he documents speak for themselves and do not require interpretation by a prosecutor testifying as an expert." There is no reasonable probability the outcome of the bifurcated trial would have been different had defense counsel successfully objected to the manner in which the prosecutor proved the prior strike convictions.

## IV

### *Imposition of the Restitution Fine and Other Mandatory Assessments*

In supplemental briefing, defendant argues that imposition of the following mandatory restitution fine and assessments violated his constitutional rights because the trial court did not determine his ability to pay before imposing them: (1) a restitution fine of $400 (§ 1202.4), (2) a court operations assessment of $80 (§ 1465.8), and (3) a court

17

facilities assessment of $60 (Gov. Code, § 70373).**4** He asks this court to stay the restitution fine and vacate the assessments.

This argument relies primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which held "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Id.* at p. 1164.) The *Dueñas* court also held "that although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

The Attorney General responds by arguing this claim is forfeited by failing to object to the imposition of the restitution fine and assessments during the sentencing hearing. Assuming, without deciding, that defendant's challenge to the restitution fine and assessments have not been forfeited, we conclude *Dueñas* was wrongly decided and reject defendant's claim on that basis.

Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section

---

**4** These amounts are correctly listed on the amended abstract of judgment filed on July 13, 2018, but incorrectly listed on the original abstract of judgment, as well as two amended abstracts of judgment, filed on July 20, 2018, and January 7, 2021, respectively.

18

1465.8 and Government Code section 70373, but not restitution fines under section 1202.4. (*Kopp,* at pp. 95-96.)

In the meantime, we join several other courts in concluding that the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.) Having done so, we reject defendant's *Dueñas* challenge to the restitution fine and other mandatory assessments imposed in this case.

## V

### *Correction of the Abstract of Judgment*

Defendant was originally sentenced to an indeterminate term of 25 years to life after the trial court denied his *Romero* motion. Thereafter, the trial court recalled this sentence pursuant to section 1170, subdivision (d), exercised its discretion to strike one of defendant's prior strikes, and sentenced him to a determinate term of six years. An abstract of judgment prepared on the day of the resentencing reflects the correct sentence. However, another abstract of judgment was filed the following week that reflects the recalled sentence of 25 years to life. A subsequent amended abstract of judgment was filed on January 7, 2021, that also reflects the recalled sentence. As mentioned, this abstract also incorrectly reflects the fines and fees imposed.

We shall direct the trial court to prepare a corrected abstract of judgment reflecting the sentence imposed during resentencing after the original sentence was recalled, i.e., six years for count two, and correctly setting forth the fines and fees imposed in this case. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 188 ["appellate court . . . should order the trial court to correct the abstract of judgment" where there is "an evident discrepancy between the abstract of judgment and the judgment"].)

19

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment reflecting defendant's sentence of six years for count two and correctly setting forth the fines and fees imposed in this case and to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


/s/
HOCH, J.


We concur:


/s/
HULL, Acting P. J.


/s/
RENNER, J.